150 N.J. Super. 384 (1977)
375 A.2d 1208
A-LEET LEASING CORPORATION, PLAINTIFF-APPELLANT,
v.
KINGSHEAD CORPORATION AND JERE A. SHAFIR, DEFENDANTS-RESPONDENTS.
Superior Court of New Jersey, Appellate Division.
Submitted April 26, 1977.
Decided May 26, 1977.
*387 Before Judges MATTHEWS, SEIDMAN and HORN.
Mr. Patrick Di Martini, attorney for appellant.
Messrs. Breslin and Breslin, attorneys for respondents (Mr. E. Carter Corriston, of counsel).
The opinion of the court was delivered by SEIDMAN, J.A.D.
Plaintiff A-Leet Leasing Corporation (A-Leet) brought suit against defendants Kingshead Corporation, an importing concern, and its president, Jere A. Shafir, to recover the balance claimed to be due, together with costs and attorneys fees, on a motor vehicle leasing agreement. Defendants counterclaimed, asserting that they had terminated the lease because of plaintiff's inability to repair the vehicle. They sought the return of their deposit. After a nonjury trial, the judge found in favor of defendants, dismissed the complaint and entered judgment on the counterclaim in the amount of $1023.42, without interest and costs. Plaintiff appealed. We reverse and remand for a new trial on all issues.
A-Leet is engaged in the business of purchasing from dealers vehicles previously selected by individuals and then leasing them back to those individuals at stipulated monthly rental payments over an agreed period of time. In 1972 Shafir, a resident of New Jersey, wished to purchase a Jenson automobile, a motor vehicle manufactured in Great Britain. He went to Grossman Motors in Nyack, New York, the Jenson dealer closest to his place of business and selected a 1972 Interceptor coupe which was priced at approximately $13,500. *388 Because of the cost, the dealer suggested a leasing arrangement through A-Leet.
Shortly thereafter a representative of A-Leet came to Shafir's place of business in Hackensack, and on May 1, 1972 an agreement was signed by Kingshead Corporation, the terms of which were personally guaranteed by Shafir, whereby A-Leet purchased the automobile from Grossman Motors and leased it to Kingshead Corporation for a term of 36 months at a monthly rental of $487.35. The lease provided, among other things, that the lessee would be responsible for maintenance and repairs. It also contained a "Disclaimer of Warranty" clause in which "LESSEE agrees that LESSOR is not a manufacturer or a dealer in vehicles and shall not be responsible under any warranty whether statutory or by common law for any defects in a vehicle delivered." A supplement to the lease permitted the lessee to terminate the lease at any time without prior notice, provided it exercised the option of purchasing the car for one dollar plus the full amount of all future rentals for the balance of the term. The lessee was also privileged to exercise the option to purchase for one dollar by written notice not less than 30 days before the expiration of the lease; otherwise, the car would be returned to the lessor at the end of the term. The lease further provided that in the event of default the lessor would have the right to terminate the lease without notice and repossess the vehicle.
The lessee made monthly payments until December 1972, at which time the balance due, less the deposit, was $13,010.73. The lessee then informed A-Leet that it no longer desired to keep the automobile because of a repair problem. A-Leet repossessed the vehicle in February 1973, resold it to a wholesaler for $6000 and brought this suit to recover the claimed balance of approximately $7000 plus counsel fees and costs in the sum of $1777.
Shafir testified at the trial that in September or October 1972 the car became inoperable because of a steering problem. He said that Grossman Motors sent a mechanic who, *389 after examining the car, reported that a part which had "[s]omething to do with power steering" had to be ordered. Shafir said further that although he repeatedly called the dealer, the part was not obtained. On one occasion, he said, he attended an automobile show at the Coliseum in New York where Grossman introduced him to a Jenson representative, who promised to send the part immediately. When the part still did not come, Shafir had the car towed to a gas station in Hackensack, where it remained for seven weeks. He also contacted another Jenson dealer, who was unable to help. Finally, in December 1972 Grossman told Shafir that he was unable to obtain the part and suggested that Shafir lease another car through a different leasing company. Grossman sent a tow truck for the car and took it away. Shafir acknowledged that when he signed the lease he knew that the repairs would be his responsibility and that the number of Jenson dealers in the area was limited. He said, further, that the mileage registered on the odometer in December was approximately 5000.
The Hackensack gas station mechanic testified that when the car was brought in he diagnosed the problem as a "rupture in the high pressure power steering hose" which rendered the vehicle inoperable. He said that only a Jenson hose could be used as a replacement. Although he made inquiry of at least one Jenson dealer and many other foreign car dealers, he was unable to obtain the part.
We gather from the trial judge's oral opinion findings that the car failed to meet an implied warranty of fitness; that the warranty disclaimer was unenforceable; that when Shafir was unable to repair the car "even under the warranty," he was released from his obligations under the lease, since the subject matter of the lease was thereby "frustrated," and that the resale was not "commercially reasonable."
It is no longer open to debate that when a manufacturer puts a new automobile (or, indeed, any consumer product) in the stream of trade and promotes its purchase by the public, an implied warranty that it is reasonably suitable *390 for use as such accompanies it into the hands of the ultimate purchaser. Scanlon v. General Motors Corp., 65 N.J. 582, 591 (1974); Henningsen v. Bloomfield Motors, Inc., 32 N.J. 358, 384 (1960). Furthermore, disclaimers of the obligations that normally attend a sale are not favored and are strictly construed against the seller. 32 N.J. at 373. In fact, Henningsen held that a manufacturer's attempted disclaimer of an implied warranty of merchantability and of the obligations arising therefrom was so inimical to the public good as to compel an adjudication of its invalidity. 32 N.J. at 404. See also Santor v. A & M Karagheusian, Inc., 44 N.J. 52, 64 (1965). The responsibility of a manufacturer to a consumer for economic losses, as distinguished from personal injury or property damage, may arise under the doctrine of strict liability in tort, although it may also do so under the Uniform Commercial Code or by agreement between the parties. Herbstman v. Eastman Kodak Co., 68 N.J. 1, 7 (1975).
The case under review concerns the leasing of an automobile, not its sale. In Cintrone v. Hertz Truck Leasing, etc., 45 N.J. 434 (1965), the strict liability in tort doctrine was held applicable to the rental of motor vehicles. The court said in that case that a bailor for hire, such as a person in the U-drive-it business, puts motor vehicles in the stream of commerce in a fashion not unlike a manufacturer or retailer, and such a rental must be regarded as accompanied by a representation that the vehicle is fit for operation on the public highways. 45 N.J. at 450. See Annotation, "Products Liability: Application of Strict Liability in Tort Doctrine to Lessor of Personal Property," 52 A.L.R.3d 121 (1973). Cintrone involved the type of rental business increasingly in vogue, where the bailment for hire
* * * transfers possession in exchange for the rental and contemplates eventual return of the article to the owner. By means of a bailment parties can often reach the same business ends that can be achieved by selling and buying. The goods come to user for the time being and he benefits by their use and enjoyment without the burdens *391 of becoming and remaining the owner. The owner-lessor benefits by receiving the rent for the temporary use. * * * [45 N.J. at 447; emphasis supplied]
In such transactions, according to Cintrone, there is a continuing implied warranty that the leased vehicles will be fit for use for the duration of the lease. 45 N.J. at 452. But Justice Proctor took note in his concurring opinion of "a developing practice for corporations and individuals to lease new vehicles for a year or more, and themselves provide for maintenance." He expressed the view that in this kind of situation, markedly different from the U-drive-it lease, the lessor's liability should be no greater than that of the manufacturer of the vehicle. 45 N.J. at 460.
Here, the leasing agreement differed from the usual Udrive it transaction in that it was for a long term and the lessee, aside from assuming the obligations of repairs and maintenance, was accorded the option of purchasing the vehicle at or prior to the expiration of the lease. This type of transaction is generally considered to be analogous to a sale. Its scope and purpose are aptly described in Hertz Commercial Leasing Corp. v. Transportation Credit Clearing House, 59 Misc.2d 226, 298 N.Y.S.2d 392, 395 (Civil Ct. 1969), rev'd on other grounds, 64 Misc. 910, 316 N.Y.S.2d 585 (App. Term 1970):
Equipment leasing is a recent device whereby users of goods are enabled to have sole and exclusive use thereof for such periods of time as are economically beneficial to them at advantageous costs. It has become a widely used substitute for purchase, with the lessor, in economic reality, taking the place of a financing agency and the lessee paying the equivalent of the full purchase price, plus interest, within the minimum lease period. The lessee, in effect, is the true purchaser. Under present tax laws, which appear to be the basis on which these arrangements are made, it is foreseeable that this method of transferring the right to use goods will encompass a sizeable portion of the volume of commercial transactions which have the use of goods (rather than their consumption) as their immediate economic end. *392 See also KLPR TV, Inc., v. Visual Electronics Corp., 327 F. Supp. 315 (W.D. Ark. 1971), mod. on other grounds 465 F.2d 1382 (8 Cir.1972); Sawyer v. Pioneer Leasing Corp., 244 Ark. 943, 428 S.W.2d 46 (Sup. Ct. 1968); Farnsworth, "Implied Warranties of Quality in Non-Sales Cases," 57 Colum. L. Rev. 653 (1957), Annotation, "Application of Warranty Provisions of Uniform Commercial Code to Bailments," 48 A.L.R.3d 668 (1973).
Thus, it has been held that "in this day of expanding rental and leasing enterprises," the consumer who leases a product should be given protection equivalent to the consumer who purchases. W.E. Johnson Equipment Co. v. United Airlines Inc., 238 So.2d 98 (Fla. Sup. Ct. 1970). Consequently, at least in those cases where the lessee relies upon the lessor's skill and judgment to select or furnish a suitable chattel, there is an implied warranty that the chattel shall be fit for such purpose. Id.; Redfern Meats, Inc. v. Hertz Corp., et al., 134 Ga. App. 381, 215 S.E.2d 10 (Ct. App. 1975).
It is to be noted that here Shafir himself selected the automobile from the dealer. The lessor was not involved at all in that process. Its role was simply to finance the transaction through the device of a leasing arrangement, although it is true that the actual purchase of the vehicle from the dealer was accomplished by the lessor. In such instances, a cogent argument might be made that the lessee, unlike situations in which the lessor is a dealer in motor vehicles, does not rely upon the skill and judgment of the lessor, who may be in no better position than he to detect possible defects or flaws in the vehicle leased. Therefore, the implied warranties of merchantability or fitness for use ought not to obtain. This would particularly be so where, as in this case, the dealer himself furnished the lessee a standard express warranty. See, generally, Annotation, "Warranties in connection with leasing or hiring of chattels," 68 A.L.R.2d 850, 861 (1959); but cf. Sawyer v. Pioneer Leasing Corp., supra, holding that a warranty of fitness for use applied *393 where the leased equipment was purchased by the lessor after it had been selected by the lessee from the distributor. We do not reach this interesting issue, since A-Leet does not challenge the applicability of implied warranties to this transaction, nor does it question the trial court's finding that the express disclaimer of warranty was not enforceable. Its sole contention on this issue is that defendants failed to prove a breach of implied warranties. Defendants' response, largely without support in the record, is that in reliance on A-Leet's expertise the vehicle was leased in the belief that it would remain serviceable and that its duty to make payments was conditioned upon the vehicle's being merchantable and repairable. They contend that once the vehicle "entered into a state of repair which could not be remedied there was a failure of consideration and Kingshead's duty to make payments was excused."
Since defendants claim the benefit of the implied warranties set forth in the Uniform Commercial Code, N.J.S.A. 12A:2-314 and 315, it is to be noted that § 314 provides that an implied warranty of merchantability exists if the seller is a merchant with respect to goods of that kind and that § 315 creates an implied warranty of fitness for a particular purpose only where the buyer relies on "the seller's skill or judgment to select or furnish suitable goods." Assuming that those warranties apply to the transaction here involved, neither encompasses a commitment that the motor vehicle would remain serviceable. The implied warranties referred to in the code contemplate no more than the existence of a defect or condition which causes nonmerchantability or nonfitness at the time the product was transferred. Herbstman v. Eastman Kodak Co., supra, 68 N.J. at 8. The requirement that the defect must exist at the time the product leaves the manufacturer or distributor, as the case may be, is identical to that in connection with strict liability in tort. Id. See Moraca v. Ford Motor Co., 66 N.J. 454, 460 (1975); Scanlon v. General Motors Corp., supra, 65 N.J. at 590; Jakubowski v. Minnesota *394 Mining & Mfg. Co., 42 N.J. 177, 182 (1964). But absent proof of such defect, we find neither in the Uniform Commercial Code nor in the cited cases an extension of the implied warranty to the type of lease arrangement involved here, so as to include a representation that the vehicle will not fail during the term of the lease. Moreover, we do not construe the holding in Cintrone v. Hertz Truck Leasing etc., supra, 45 N.J. at 451, which pertained to the U-driveit type of transaction, to apply to situations like this one, where the transaction is essentially equivalent to a sale and the lease arrangement is in reality a method of financing. See Scanlon v. General Motors Corp., supra 65 N.J. at 595.
The trial judge addressed himself to the warranty issue in his oral opinion as follows:
In any event, the Court finds that what happened in this case is that the car did fail, within approximately five to seven months, to meet the standards of being a vehicle that was suitable for traveling on the roads. There are obviously new car warranties that are required in fact to be given not only in this state but in this country. The car did not meet that, notwithstanding purported disclaimer as to being a manufacturer or dealer in the lease and not being responsible for any warranties whether statutory or at common law for any defects. That is against public policy and would not be enforced in this court, in any event. Even if I did give account to that, there are obviously warranties that apply and there is a failure of the very subject of the rental agreement in this case. If the document is treated as a lease of a vehicle or equipment type of lease, then, of course, there are certain dealer warranties and in New Jersey in a suit by even a holder in due course under a negotiable instrument, let alone a lessee, there is a defense that is available to the lessee and I refer to such cases of Unico v. Owen, 50 N.J. 101, a 1967 case. * * *
We find the foregoing troublesome, since it contains an admixture of that which may be pertinent and that which is not, so that we cannot tell whether the result reached was validly premised.
We do not doubt that sales of new automobiles are now universally accompanied by express warranties made by the *395 manufacturer. Defendants acknowledge that the "usual warranty book" was issued to them by the dealer covering "[t]welve months or 12,000 miles," presumably to protect against defective parts and workmanship. We are unaware of any obligation on the part of the lessor here to issue separately similar express warranties. As for the disclaimer clause, we know of no rule that broadly declares such clause to be against public policy even if it is inserted in the contract by one who is neither a manufacturer of nor a dealer in the product involved. But it does not matter here, since, as noted previously, no issue is raised as to the applicability of implied warranties of merchantability or fitness for use.
As to the trial judge's holding that the motor vehicle in this case did not meet "new car warranties that are required * * * to be given," we are unable to say whether he meant a breach of some undefined express warranty or of an implied warranty. If the former, then without a specification of the express warranty to be applied, we cannot test the correctness of his finding. If, however, the trial judge intended his finding to relate to an implied warranty, then it suffers from the additional infirmity of being conclusionary in nature, without supporting findings of fact. While we are handicapped by an inadequate presentation below of the positions taken by the parties, we must assume that at least one theory relied on by defendants was the strict liability doctrine. If so, then they had the burden of establishing that the product was defective, that the defect existed while the product was in the control of the plaintiff, and that damage resulted therefrom. Cf. Scanlon v. General Motors Corp., supra, 65 N.J. at 590.
The proofs adduced by defendants were that the steering mechanism of the automobile malfunctioned either late in September or early in October 1972, and that the problem was diagnosed as a rupture in the power steering hose causing a loss of brake fluid. The mechanic who testified for defendants did not explain the cause of the rupture *396 or express any opinion on whether, if the steering hose was defective, the defect existed while the vehicle was in the control of the lessor. We pause to stress once more our assumption, solely for the purpose of this appeal, that the lessor's responsibility was the same as that of the manufacturer. In the absence of direct evidence of a defect emanating from a manufacturing flaw, or other evidence permitting an inference of such condition prior to the lease, it was necessary for the lessee to negate other causes for the failure of the product for which the lessor would not be responsible. Jakubowski v. Minnesota Mining & Mfg. Co., supra, 42 N.J. at 184. As the court said in Scanlon, supra, 65 N.J. at 594, this type of proof, depending upon the complexity of the product, may require the testimony of an expert witness as to the various possible explanations for the mishap. While circumstances may be shown which create an inference that a defect existed prior to transfer of the product to the consumer, Jakubowski v. Minnesota Mining & Mfg. Co., supra, no such evidence was introduced here. Cf. Scanlon v. General Motors supra 65 N.J. at 599. The only evidence in this case was that the power steering hose ruptured four or five months after the automobile had been acquired and had been operated approximately 5000 miles.
But even if these facts might have supported an inference of a preexisting defect, the trial judge made no clear-cut findings on the issue. Rather, he chose to rest his determination on a finding that "the car was not able to be repaired and was inoperable, the entire subject matter of the lease was frustrated. * * * [W]hen the car was unable to be repaired even under the warranty, the lessee is released from the obligation of further payment under the lease."
Defendants argue that the parties must have contemplated that the vehicle would remain roadworthy or at least that it would be repairable, and that when, through no fault of theirs, "the fundamental basis of the contract ceases to exist * * * the lessee should be excused from making payments." They contend further, but without any evidential support in *397 the record, that at the time of the execution of the lease, A-Leet represented to Kingshead that the Jenson Interceptor coupe would fulfill the needs of Kingshead, and that Kingshead relied upon A-Leet's representations that routine maintenance and repair would keep the vehicle serviceable.
Defendants and the trial judge seemingly invoke the doctrines of implied condition and frustration of purpose, which are modifications of the long-established rule of the law of contracts that performance will not be excused merely because of the occurrence of an unexpected contingency or circumstance not provided for in the agreement. Adams v. Jersey Central Power & Light Co., 36 N.J. Super. 53, 69 (Law Div. 1955), aff'd 21 N.J. 8 (1956). Simply stated, the concept is that a contract is to be considered "subject to the implied condition that the parties shall be excused in case, before breach, the state of things constituting the fundamental basis of the contract ceases to exist without default of either of the parties." Edwards v. Leopoldi, 20 N.J. Super. 43, 54 (App. Div. 1952), certif. den. 10 N.J. 347 (1952) See also Porcelli v. Titus, 108 N.J. Super. 301, 313 (App. Div. 1969), certif. den. 55 N.J. 310 (1970). But relief from performance of contractual obligations on this theory will not be lightly granted; the evidence must be clear, convincing and adequate. Adams v. Jersey Central Power & Light Co., supra 36 N.J. Super. at 70.
It is quite debatable whether the above doctrine, even if otherwise applicable, may be raised here, for to sustain the defense in a contract action it is not sufficient that the desired object of but one of the contracting parties has been frustrated. It is "their common object that has to be frustrated, not merely the individual advantage which one party or the other might have achieved from the contract." Edwards v. Leopoldi, supra 20 N.J. Super. at 55. Such was not the case here.
In any event, the trial judge concluded that repairing the car was either impossible or could not reasonably have been accomplished, thus entitling defendants to relief. *398 But even if such conclusion is supported by the record, defendants' right to relief would nonetheless have to depend upon proof of a defect which existed when the product was transferred to the lessee. As to this, we have already noted a lack of appropriate findings of fact below. However, a finding that such defect did so exist would still not resolve the problem. To justify their termination of the contract, defendants would be required to establish further that the contractual breach was material, stated in terms of substantial impairment of value to them. Herbstman v. Eastman Kodak Co., supra, 68 N.J. at 9.
The facts in this case do not support the conclusion that the motor vehicle could not be repaired; obviously it could, since all that was required was a replacement hose. No doubt the repair would have been relatively minor if the part had been readily available. The issue is whether in the present circumstances the repair could nevertheless have reasonably been effected without materially impairing the value of the motor vehicle to the lessee. The trial judge did not deal with this issue. He simply concluded that the "car was not able to be repaired and was inoperable."
We may take judicial notice that Jenson automobiles are not widely sold in this country. Shafir knew it and, moreover, was aware that there was a limited number of Jenson dealers in the area. Under the terms of the lease agreement, he was responsible for repairs. He endeavored to have the dealer take care of the matter under the express warranty. He also made known his need for a replacement hose to a Jenson representative at an automobile show in New York (the record does not disclose when) and was promised immediate shipment of the part from England. There is no indication, however, of any follow up on his part, or any attempt by him to expedite delivery by putting to use his knowledge and experience as an importer.
We do not mean to imply that Shafir failed to take reasonable measures toward repairing his car. We express no *399 opinion thereon one way or the other. The point we make is that the testimony on the subject should have been fully evaluated by the trial judge followed by precisely stated findings of fact and conclusions. We are thoroughly aware of the inadequate record below. Neither side really undertook to develop properly the complex and to an extent novel issues presented. This undoubtedly produced that which we conceive to be deficiencies in the trial judge's disposition of the case.
We are not satisfied that a remand merely for additional factfinding will suffice. We think that the state of the record is such that there should be a new trial on all issues with full opportunity accorded each side to present such additional evidence as may be necessary to flesh out the difficult issues. There should be a new pretrial conference for the careful delineation of all the pertinent issues, and to the extent necessary the pleadings should be fully amended accordingly. Since there must be a remand for these purposes, we see no need to consider any of the judge's comments and rulings on the matter of damages, should plaintiff prevail. Our silence, however, is not to be construed necessarily as acquiescence therein. Furthermore, we do not express any opinion on whether the resale of the car was "commercially reasonable," or whether the issue was properly stated in that fashion. We would expect the parties to research those problems fully and to furnish the trial judge with adequate briefs thereon. Since the question is not before us, we likewise forbear comment on any cause of action either party may have against the dealer for breach of warranty, either express or implied.
The judgment is reversed and the matter is remanded for a new trial on all issues consistent with the foregoing. We do not retain jurisdiction.