67 A.3d 702

JB POOL MANAGEMENT, LLC, PLAINTIFF–APPELLANT, v. FOUR SEASONS AT SMITHVILLE HOMEOWNERS ASSOCIATION, INC., DEFENDANT–RESPONDENT.

Superior Court of New Jersey
Appellate Division

Argued March 18, 2013—Decided June 13, 2013.

---

234

Before Judges SABATINO, FASCIALE and CARROLL.

*Kurt David Raatzs* argued the cause for appellant (*McDowell Posternock Law*, attorneys; *Mr. Raatzs*, on the brief).

*Samuel J. McNulty* argued the cause for respondent (*Hueston McNulty, P.C.*, attorneys; *Mr. McNulty*, of counsel and on the brief; *Edward J. Turro*, on the brief).

The opinion of the court was delivered by

SABATINO, J.A.D.

This case arises out of a one-year contract in which appellant, a pool management company, agreed to supply a condominium association with lifeguards and maintenance services for the association's indoor pool. During the term of that contract, a mold infestation was discovered in the pool facilities, prompting government officials to order the pool closed for over seven months while the mold was remediated. The pool management company sued the association for breach of contract, seeking to recover four months of service fees that the association had not paid while the pool was closed.

Over the pool company's objection, the trial court charged the jury that the association's obligation to pay the monthly fees during the period when the pool was closed could be excused under the doctrine of frustration of purpose, a theory that the association had not raised in its affirmative defenses. Having received the guidance of this instruction, the jury found the association was not liable for the four months of disputed fees. The jury also found the pool management company liable on the association's counterclaim for damage it caused to a pool cover.

In this case of first impression, we prospectively hold that the doctrine of frustration of purpose generally should be pleaded in the courts of our state as an affirmative defense by litigants seeking to invoke that doctrine to avoid their contractual duties. Because the frustration doctrine was not expressly raised by the

association in this case before trial, and instead was identified, sua sponte, by the trial judge during the charge conference as a more suitable alternative to a proposed charge of impossibility, we reverse the final judgment dismissing the breach of contract claim. To rectify apparent prejudice to the pool company arising from the late notice, we remand for additional discovery focused on that defense, followed by a new trial.

We further direct the trial court, in light of the additional discovery and testimony that may be adduced on remand, to reexamine its finding that the "underlying purpose of [the] contract was conditioned upon the pool being open for use," and to consider explicitly if that finding concerning the parties' intentions can be reconciled with the contract's provision that "[t]here will be no reduction in charges of the contract amount for any closing."

Lastly, we affirm the counterclaim award and reject appellant's argument that the jury instructions on the counterclaim should have been based upon principles of negligence rather than contract law.

I.

The plaintiff and counterclaim-defendant in this case, JB Pool Management, LLC, ("JB Pool") is a private company that provides lifeguards and pool maintenance services to various customers in New Jersey. Defendant-counter-claimant Four Seasons at Smithville Homeowners Association, Inc. ("Four Seasons" or "the association") is a not-for-profit entity that maintains the common property of a residential community in Galloway Township. The retirement community has approximately 1,100 houses. The condominium property includes both an outdoor pool and an indoor pool for use by the association's members and their guests.

In or about 2004, JB Pool began entering into annual agreements to provide lifeguard and pool management services to Four Seasons for the indoor pool and the outdoor pool, as well as aerobics classes. Separate contracts were executed for the indoor

pool and the outdoor pool. The successive contracts typically covered a full calendar year from January 1 through December 31.

As to calendar year 2008, the relevant period for this lawsuit, the parties' indoor pool contract called for JB Pool to receive an annual fee of $61,880. The contract specified that the annual fee was to be paid in monthly installments of $5,688, except for July and August when the monthly installments were reduced to $2,500.

One lifeguard was to be provided by JB Pool at all times during the hours specified by the contract. Among other things, the lifeguard was responsible for keeping the pool clean, vacuuming it, backwashing the filter, cleaning pool filter cartridges, and maintaining the pool area in a neat and orderly condition. JB Pool was further obligated to provide chemicals to treat the water in the pool, and to test the water daily. The contract also required JB Pool to maintain a $2 million liability insurance policy, naming the association as an additional insured. The indoor pool was scheduled to be open year-round, except for New Year's Day, Thanksgiving, and Christmas.

Significantly for the present dispute, the contract contained the following terms that would apply in the event of a pool closure:

**DATES AND TIMES OF SERVICES:**

*The pool will be open during the stated dates and times with the following exceptions:*

1. *Inclement weather*—[JB Pool] will determine if the weather is unsatisfactory— for pool operation based on the guidelines from the NEW JERSEY STATE SANITARY CODE:

"Outdoor bathing shall be prohibited during an electrical storm."

If the pool is determined not to be able to be opened before 4:00 p.m. on any day, the pool will be closed the entire day. If the pool must be closed at least one hour after 4 p.m. on a given day, then it will not be reopened that day. *There will be no reduction in charges as outlined in this agreement.* The Customer will be notified of each closing.

2. [JB Pool] will have *no liability for its failure to perform this Agreement, or any part thereof, where such failure is attributable to reasons beyond its control, including but not limited to inclement weather, acts of God, acts of war, labor disputes, strikes, riots, fire or other casualty, or customer requested closing.* There will be *no reduction in charges of the contract amount for any closing.*

[Emphasis added.]

The 2008 contract further provided that it "shall be governed by the laws of the State of New Jersey." It was signed in November 2007 by JB Pool's president, Jacqueline Bartilucci, and a representative of Four Seasons.

Toward the end of January 2008, shortly after the annual contract period began, mold was discovered in the indoor pool area. The pool was closed while efforts to remediate the mold problem were undertaken, apparently at the direction of the county board of health. Although initially the parties had hoped that the mold problem could be abated quickly, the pool was not reopened until after Labor Day in September 2008. Consequently, the indoor pool was closed for over seven full months (February, March, April, May, June, July, and August) of the twelve-month contract period for 2008. The outdoor pool remained open.

For the first three full months while the pool was closed (February, March, and April), JB Pool billed Four Seasons its usual monthly fee, and Four Seasons paid those sums.[1] However, as the problem progressed, discussions took place in about April 2008 between the association's Pool Committee and Bartilucci. According to Bartilucci, and as acknowledged by the testimony of Josephine Mongiello, who was then the Pool Committee's Chairwoman, the Pool Committee requested that the lifeguards for the indoor pool continue to be paid while the indoor pool was closed.[2] As a result of those discussions, the billing arrangements changed, at least for several months.

Although the trial testimony is inconsistent in certain respects, the record does show that JB Pool did not contemporaneously charge Four Seasons the monthly indoor pool service fees for

[1] Four Seasons has not sought to recoup those initial three months of payments from JB Pool.

[2] The record is unclear whether the lifeguards were all reassigned to the outdoor pool or to other JB Pool customers, or whether they and the other lifeguards were able to work the same number of hours at the open locations.

May, June, July, and August 2008. Instead, JB Pool sent invoices to Four Seasons charging only the usual sums for the outdoor pool, and reciting that, with respect to the indoor pool, there was "no charge due to pool being closed." Bartilucci recalled that these indoor pool charges were deferred at the request of the association because of the dissatisfaction of its residents about the closing of the pool and clubhouse. Four Seasons, on the other hand, contended that JB Pool permanently waived the charges since it was not providing its regular services for the indoor pool during that timeframe. In any event, it is undisputed that Four Seasons did not remit the four months of charges to JB Pool, which otherwise would have totalled $16,376.

When the 2009 annual contract for pool services was being negotiated, Bartilucci made a proposal in a December 2008 letter to the association's property manager, Allen Haller. Specifically, Bartilucci proposed that JB Pool would "forgive" the $16,376 balance of the 2008 contract for the indoor pool, which had not been charged when the pool was closed, provided that the association agree to grant JB Pool a contract extension through December 31, 2009, and also agree to refrain from exercising its right to cancel the contract during that time.[3] Evidently, Four Seasons never accepted that particular proposal. Instead, the parties entered into a 2009 contract extension that was silent concerning the previous 2008 four-month period of nonpayment. The parties entered into another contract for 2010, which again did not address the 2008 nonpayment issue. In the meantime, the parties' relationship soured.

On July 6, 2010, JB Pool gave Four Seasons written notice that it was terminating the parties' agreement. Two days later, JB Pool sent the association an invoice for $16,376 relating to the four unpaid months from 2008. Four Seasons declined to pay that invoice, thereby precipitating the present litigation.

---

[3] In that regard, we note that the 2008 contract had provided that either party could cancel the agreement with sixty days' notice.

In September 2010, JB Pool filed a three-count complaint in the Law Division against Four Seasons, alleging breach of contract (count one), unjust enrichment (count two), and quantum meruit (count three). The complaint sought payment of $22,357.25, a sum which apparently included late fees.

In October 2010, Four Seasons filed an answer denying liability, along with ten enumerated separate defenses, and a counterclaim alleging that JB Pool had negligently damaged the association's indoor pool cover when it closed the pool. Among other things, the association's separate defenses included contentions that JB Pool's complaint had failed to state a claim upon which relief may be granted, that the association had not breached any obligations or duties to JB Pool, and that JB Pool's claims were barred by the doctrines of estoppel, waiver, and laches. Notably, the separate defenses did not mention the contractual doctrines of impossibility of performance nor frustration of purpose.

About a year later, Four Seasons moved for summary judgment, which JB Pool opposed. In its reply brief in support of that motion, Four Seasons asserted, for the first time in the lawsuit, that JB Pool's claims for contract damages were precluded by the doctrine of impossibility of performance. The reply brief cited Sections 237, 239, and 267 of the *Restatement (Second) of Contracts* (1981) (the *"Second Restatement"*). The brief discussed the legal principles delineating impossibility and various reported decisions applying that particular doctrine of contract avoidance. The reply brief did not mention, however, the related doctrine of frustration of purpose.

The trial court denied summary judgment and the matter proceeded to a three-day jury trial in March 2012. The jury heard testimony from Bartilucci, Mongiello, Haller, and the former President of the association's Board of Trustees, Katherine McGovern. The jury also considered numerous exhibits including the contract documents, JB Pool's invoices, and various written communications between the parties.

The trial testimony indicated that during the four-month hiatus in 2008 when the indoor pool was closed, JB Pool provided only limited services to the association, which specifically included draining the pool at the association's request. Bartilucci testified in this regard that JB Pool continued to test, backwash, and vacuum the pool while it was closed, although those activities were not acknowledged by the association's property manager, Haller. In addition, JB Pool continued to maintain the insurance coverage called for under the contract. Even so, it is undisputed that no lifeguard services were provided by JB Pool for the indoor pool while it was closed. Because JB Pool did not quantify its expenses for the limited services it performed while the pool was closed, the trial judge ultimately dismissed its claims for unjust enrichment and quantum meruit before summation.

During the midst of the trial, JB Pool's counsel objected to Four Seasons presenting any evidence or legal argument concerning the doctrine of impossibility. Emphasizing that the doctrine had not been identified in the association's pleadings as an affirmative defense, counsel argued that JB Pool had been deprived of fair notice of that theory and an opportunity to conduct discovery concerning it. The association's lawyer countered that there was no unfair surprise. He noted that the theory had been elucidated in the briefing on the summary judgment motion, also pointing out that further discovery had been conducted after the motion was denied. The trial judge reserved decision on the issue, permitting the trial to proceed in the meantime.

The judge ultimately addressed the impossibility issue during the charge conference. In essence, the judge found that JB Pool could not have been surprised by the association's contention that the mold-related shutdown of the indoor pool excused its monthly payment obligations during the closure period. However, the judge observed that the language in the model jury charge concerning the impossibility doctrine did not precisely fit the present case. The judge noted that the impossibility doctrine pertains to situations in which a supervening event makes a

defendant's obligations impractical or impossible to perform. Here, perhaps recognizing that Four Seasons had the ability to pay JB Pool when the indoor pool was closed, the judge found that the impossibility doctrine was not on point. Instead, the judge observed, the related doctrine of frustration of purpose where— performance may be excused where the "main purpose" of a contract is frustrated or destroyed—was more appropriately implicated.

JB Pool's counsel objected to the court interjecting the doctrine of frustration of purpose. She repeated her contentions of unfair surprise and prejudice, and the lack of discovery on that issue. The court rejected those contentions, finding that neither party had contemplated an extended closure of the pool during the contract period. Meanwhile, the association's counsel acceded to the court providing a jury charge on frustration rather than impossibility, although he expressed "some chagrin" about having overlooked the charge in his trial preparation.

Consequently, counsel addressed frustration principles, in an impromptu fashion, in their respective summations. Counsel also addressed the association's separate claim that JB Pool had waived its right to collect on the unpaid four months of charges. The court then issued the following charge to the jury on frustration of purpose, tracking the language of the model charge and notably making a judicial finding that "the purpose of the underlying contract was that the [indoor] pool would be opened for use."

Now, sometimes, if the main purpose of a contract is frustrated or destroyed, the plaintiff may not enforce the contract against the defendant. That is, the plaintiff may not make the defendant perform what the contract required or make the defendant pay money damages for failing to do what the contract required.

The defendant claims that the main purpose of the contract in this case was frustrated or destroyed, because this pool was closed by the State due to mold infestation. The plaintiff denies this.

*In order to prove a defense based on frustration of purpose, the defendant must first show, by clear and convincing evidence, that the plaintiff and the defendant implicitly agreed that their contract and their promise were conditioned on the pool being open for use.*

*That is a question for me to decide, and I have found that the parties did implicitly agree that the purpose of the underlying contract was that the pool*

*would be opened for use. That formed the foundation of the contract.* But, this does not end the issue.

Defendant must still persuade you, by clear and convincing evidence, that the condition was not merely one of several, but was the essence of the contract. Defendant must also show that the closing of the pool by the mold occurred, that it occurred through no fault of the defendant, and that it totally destroyed the whole purpose of the contract.

It is important to keep in mind that only those circumstances that the defendant could not reasonably be expected to have known will excuse the defendant's performance based on frustration of purpose. If the defendant ... should reasonably have been expected to be aware of the circumstances that frustrated the contract's purpose, then the defendant may not be excused from [d]efendant's obligation to perform the contract.

[Emphasis added.]

During deliberations, the jurors requested, among other things, that the court clarify the charge on frustration of purpose. The jurors also requested a written copy of the charges as a whole. The judge explained to the jurors that, given the logistics of the charge's preparation, he was unable to furnish them with a written copy of the charge, but did repeat the frustration charge orally in open court with the consent of both counsel.

After further deliberations, the jury returned a verdict the next day. By a six-to-two vote, the jurors concluded that Four Seasons had not breached its obligations and that it owed JB Pool nothing further on the 2008 contract. The jury separately and unanimously found that Four Seasons had prevailed on its counterclaim regarding the damaged pool cover, and awarded $1,535.20 in counterclaim damages.

JB Pool now appeals the final judgment, principally arguing that the trial court improperly and prejudicially charged the jury on the doctrine of frustration of purpose, despite the fact that Four Seasons had not raised the doctrine as an affirmative defense in its pleadings. JB Pool contends that by such omission, Four Seasons waived the affirmative defense. JB Pool further argues that the trial court erred in failing to enforce the language in the contract that "[t]here will be no reduction in charges of the contract amount for *any* closing." (Emphasis added). Finally, JB Pool contends that the counterclaim award should be vacated

because the court failed to instruct the jury on the elements of negligence with respect to the proofs relating to the pool cover.

## II.

### A.

The respective concepts of impossibility of performance and frustration of purpose are, in essence, doctrinal siblings within the law of contracts. Both doctrines may apply to certain situations in which a party's obligations under a contract can be excused or mitigated because of the occurrence of a supervening event. The supervening event must be one that had not been anticipated at the time the contract was created, and one that fundamentally alters the nature of the parties' ongoing relationship. *See generally Second Restatement* at § 261 (regarding impossibility or "impracticability" of performance) and § 265 (regarding frustration of purpose); *Edwards v. Leopoldi,* 20 *N.J.Super.* 43, 49, 89 *A.*2d 264 (App.Div.) (noting that principles of impossibility of performance appear to be subsumed within the concept of frustration of purpose), *certif. denied,* 10 *N.J.* 347, 91 *A.*2d 671 (1952).

Both the impossibility and frustration doctrines are concerned with "[a]n extraordinary circumstance [that] may make performance [of a contract] so vitally different from what was reasonably to be expected as to alter the essential nature of that performance." *Second Restatement* ch. 11, intro. note at 309. The doctrines stem from the concept of an implied condition within a contract. As this court observed decades ago in *Edwards, supra,* "courts under a more modern philosophy [of contract law] may and do exercise the power to infer from the nature and substance of the contract and the surrounding circumstances that *a critical and vital condition which is not expressed* constituted *a foundation* on which the parties contracted." 20 *N.J.Super.* at 57, 89 *A.*2d 264 (emphasis added). "[T]he concept is that a contract is to be considered 'subject to the *implied condition* that the parties shall be excused in case, before breach, the state of things

constituting *the fundamental basis of the contract* ceases to exist without default of either of the parties.' " *A–Leet Leasing Corp. v. Kingshead Corp.,* 150 *N.J.Super.* 384, 397, 375 *A.2d* 1208 (App. Div.) (emphasis added) (quoting *Edwards, supra,* 20 *N.J.Super.* at 54, 89 *A.2d* 264), *certif. denied,* 75 *N.J.* 528, 384 *A.2d* 508 (1977); *see also Facto v. Pantagis,* 390 *N.J.Super.* 227, 231, 915 *A.2d* 59 (App.Div.2007) (applying similar principles of implied condition to a claim of "impracticability" of performance).

■ A successful defense of impossibility (or impracticability) of performance excuses a party from having to perform its contract obligations, where performance has become literally impossible, or at least inordinately more difficult, because of the occurrence of a supervening event that was not within the original contemplation of the contracting parties. *Facto, supra,* 390 *N.J.Super.* at 231, 915 *A.2d* 59; *see also M.J. Paquet, Inc. v. N.J. Dep't of Transp.,* 171 *N.J.* 378, 390–91, 794 *A.2d* 141 (2002); *Second Restatement* § 263.

By comparison, under the related doctrine of frustration of purpose, the obligor's performance can still be carried out, but the supervening event fundamentally has changed the nature of the parties' overall bargain. *Edwards, supra,* 20 *N.J.Super.* at 55, 89 *A.2d* 264 (observing that the frustration doctrine pertains to situations in which the parties' "common object" has been frustrated by "destruction or cessation [that] demolishes the attainment of the vital and fundamental purpose of the contracting parties").

The *Second Restatement* expresses the concept of frustration of purpose in Section 265 as follows:

> Where, after a contract is made, a party's principal purpose is *substantially frustrated without his fault* by the occurrence of an event the non-occurrence of which was *a basic assumption* on which the contract was made, his remaining duties to render performance are discharged, *unless the language or the circumstances indicate the contrary.*
>
> [Emphasis added.]

So defined, frustration of purpose "deals with the problem that arises when a change in circumstances makes one party's performance worthless to the other, frustrating his purpose in making the

contract." *Id.* at cmt. (a). "The frustration must be so severe that it is not fairly to be regarded as the risks that [the party invoking the doctrine] assumed under the contract." *Ibid.*

The frustration doctrine is historically rooted in the so-called "coronation cases" from English courts, in which the payment obligations of parties who had leased rooms to obtain a superior view of the King's coronation parade were excused because their fundamental objective in leasing the room was thwarted when the parade was postponed. *See Edwards, supra,* 20 *N.J.Super.* at 50–51, 89 *A.*2d 264 (citing *Krell v. Henry,* 2 *K.B.* 740 (C.A.1903)); *see also Second Restatement* § 265, illustration 1.

American courts have applied similar concepts of frustration of purpose, consistent with the principles set forth in the *Second Restatement.* *See, e.g., 20th Century Lites v. Goodman,* 64 *Cal. App.*2d *Supp.* 938, 149 *P.*2d 88 (1944) (discharging a defendant's obligations to pay a plaintiff for a three-year lease of neon light advertising of the defendant's business after a government regulation was enacted prohibiting the lighting of such signs); *Chase Precast Corp. v. John J. Paonessa Co.,* 409 *Mass.* 371, 566 *N.E.*2d 603 (1991) (excusing a highway construction company from its contractual obligation to purchase concrete medians when government plans for the project were modified to obviate the need for such medians); *In re Sheppard,* 328 *Wis.*2d 533, 789 *N.W.*2d 616, 617 (App.) (relieving an estate from decedent's contract to purchase flight instruction services because his death "substantially frustrated the contract's principal purpose"), *petition for appeal denied,* 329 *Wis.*2d 374, 791 *N.W.*2d 382, *cert. denied,* — *U.S.* ——, 131 *S.Ct.* 506, 178 *L.Ed.*2d 371 (2010).

Although the New Jersey Supreme Court has not yet analyzed the doctrine in depth, principles of frustration of purpose have long been recognized, if not frequently discussed, in our state.[4] *See, e.g., Toll Bros. v. Bd. of Chosen Freeholders,* 194 *N.J.* 223,

---

[4] The sparse number of reported New Jersey decisions discussing frustration of purpose may be attributable to the use of formal written contracts drafted by counsel in many commercial settings, in which the parties explicitly allocate the

249, 944 *A.*2d 1 (2008) (observing that a developer's agreement with a municipality may be nullified if the governing body repeals a resolution that is an implied condition of that agreement and captures the "fundamental purpose" of the agreement); *A–Leet Leasing, supra,* 150 *N.J.Super.* at 397–98, 375 *A.*2d 1208 (recognizing the frustration doctrine but remanding the case to the trial court to develop the record more on that concept); *Edwards, supra,* 20 *N.J.Super.* at 55–59, 89 *A.*2d 264 (similarly recognizing the doctrine, but finding it factually inapplicable to exonerate a labor union from its contractual duty to remit its member dues to a national labor organization which had lost its affiliation with the CIO); *see also Nye v. Ingersoll Rand Co.,* 783 *F.Supp.*2d 751, 766 (D.N.J.2011) (likewise recognizing the frustration doctrine in a case involving the application of New Jersey law); *Unihealth v. U.S. Healthcare, Inc.,* 14 *F.Supp.*2d 623, 634 (D.N.J.1998) (same).

██ A key facet of the frustration of purpose doctrine, as it is applied in this state, is that "relief from performance of contractual obligations on this theory will not be lightly granted[.]" *A–Leet Leasing, supra,* 150 *N.J.Super.* at 397, 375 *A.*2d 1208. The evidence satisfying the doctrine's requirements "must be clear, convincing and adequate." [5] *Ibid.* (citing *Adams v. Jersey Cent. Power & Light Co.,* 36 *N.J.Super.* 53, 70, 114 *A.*2d 776 (Law Div.1955), *aff'd,* 21 *N.J.* 8, 120 *A.*2d 737 (1956)); *see also Edwards, supra,* 20 *N.J.Super.* at 57, 89 *A.*2d 264 (noting that affirmative proof of the implied condition must be "clear and convincing").

## B.

██ Here, the trial judge astutely recognized that the most appropriate doctrine that might relieve Four Seasons of its con-

---

risks of supervening events to one side or another. In addition, it might be true that business people often tend to work out their problems and differences when a truly unforeseeable calamity arises.

[5] We recognize that the term "adequate" in this quoted passage is redundant, and that the concept of "clear and convincing" proof suffices to describe the litigant's burden.

tractual duties for payment to JB Pool for the four months when the indoor pool was closed is not impossibility of performance, but rather frustration of purpose. The judge correctly noted that the impossibility doctrine does not readily fit the facts of this case.[6] Instead, the frustration of purpose doctrine, which, the judge noted, follows in the section immediately after impossibility within the model civil jury charges, is the concept that most closely relates to the association's theory here for resisting liability, in addition to its waiver defense. In this regard, the judge should be commended for his perceptiveness, as well as defense counsel for his candor to the court in acknowledging his improvident designation of the most appropriate defense as "impossibility" rather than "frustration."

The procedural problem, however, that arises here is that JB Pool's counsel was not given notice that the frustration doctrine was being invoked in this case until the charge conference, long after discovery was completed. The trial judge detected no prejudice flowing from that late notice. We respectfully disagree. Had JB Pool's trial counsel been alerted sooner that her adversary would be arguing frustration of purpose to the jury, she might well have explored the elements of that doctrine in discovery and in her trial preparation.

For example, JB Pool might have pursued discovery regarding whether any actions or inactions on the part of the association might have contributed to the mold problems that led to the pool's closure. In this regard, counsel might have deposed on that subject the governmental health officials who closed the pool, or representatives of Four Seasons, in an effort to challenge the trial court's premise that the mold problem was totally unanticipated by the association. JB Pool's attorney also might have amplified the testimony of her trial witnesses to address the intention of the

---

[6] *But cf. Second Restatement* § 268 and comments (indicating that, in some circumstances, a payor may be excused from performance when the payee's performance is rendered impracticable).

parties at the time the contract was entered into, exploring whether the risk of a lengthy closure for *any* reason, if not mold, had been envisioned [7] and allocated to one party or another. In that vein, JB Pool also might have undertaken to have one or more witnesses address the intended meaning of the contract's *force majeure* clause, as well as its specific related language that the contract charges would not be reduced for "any closing."

To be sure, we cannot ascribe significant blame to Four Seasons for this failure of notice because neither the Court Rules, as presently written, nor the present case law in our State, explicitly require the doctrine of frustration of purpose to be pleaded as an affirmative defense. The applicable rule, *Rule* 4:5–4, ("Affirmative defenses; misdesignation of defense and counterclaim") simply provides:

> A responsive pleading shall set forth specifically and separately a statement of facts constituting an avoidance or affirmative defense *such as* accord and satisfaction, arbitration and award, contributory negligence, discharge in bankruptcy, duress, estoppel, failure of consideration, fraud, illegality, injury by fellow servant, laches, license, payment, release, res judicata, statute of frauds, statute of limitations, and waiver. If a party has mistakenly designated a defense as a counterclaim or a counterclaim as a defense, the court, on terms if the interest of justice requires, shall treat the pleading as if there had been a proper designation. [Emphasis added.]

In practice, the Rule "requires that affirmative defenses be pleaded based on a statement of facts constituting an avoidance or affirmative defense and not merely by legal conclusion." Pressler & Verniero, *Current N.J. Court Rules,* comment 1 on *R.* 4:5–4 (2013). Notably, however, neither the affirmative defenses of frustration of purpose nor impossibility of performance are listed in the Rule.

Although *Rule* 4:5–4 is intended to be illustrative and not exhaustive of all viable affirmative defenses, *see Brown v. Brown,* 208 *N.J.Super.* 372, 384, 506 *A.*2d 29 (App.Div.1986), we are loathe to declare that the association waived these defenses here by

---

[7] Although Bartilucci testified that neither side had anticipated a closure of the indoor pool from a mold problem, that does not rule out the anticipation of a possible lengthy closure for more generic reasons.

omitting them from its responsive pleading, in light of the dearth of precedent mandating such a pleading. Given the unsettled state of the law, we do not believe that imposing such a pleading requirement on Four Seasons in this case after the fact would be consistent with principles of substantial justice. *See Heimbach v. Mueller*, 229 *N.J.Super.* 17, 25–26, 550 *A.*2d 993 (App.Div.1988) (requiring courts to consider public policy and exceptional circumstances in applying the Rule). Instead, we hold that, in future cases, the defense of frustration of purpose, or impossibility of performance, be raised in a responsive pleading, unless exceptional circumstances excuse that oversight.[8] Indeed, the model jury charges already treat these doctrines as affirmative defenses. *See Model Jury Charges (Civil)* "Affirmative Defenses" 4.10(N)(g) (impossibility) and 4.10(N)(h) (frustration of purpose).[9] Hence, the appropriate remedy in the present case is to vacate the final judgment and remand for additional discovery germane to the frustration defense and a new trial.

## C.

A second and independent reason for reversal and a remand in this case stems from the trial judge's analysis of the frustration of

[8] We refer this issue to the Supreme Court's Civil Practice Committee to consider the adoption of a corresponding amendment to *Rule* 4:5–4 to include these two affirmative defenses. We further suggest that the Model Civil Jury Charge Committee should consider whether the Model Charge on frustration should be revised to consider whether the current charge is internally redundant, and whether it could lead to inconsistent judge/jury determinations, insofar as it first calls for the *judge* to decide by clear and convincing evidence that an implied condition was "a condition or foundation" of the contract, but then, as a second element instructs the *jury* to decide whether that foundational condition was "the essence" of the contract. *Model Civil Jury Charge* 4.10(N)(h). We find it difficult to conceive how an implied condition of a contract could be part of the "foundation" of that agreement but not also its "essence."

[9] *See also Enriquez v. Kokomo Props., LLC,* 39 *So.*3d 198, 200 (Alà.Civ.App. 2009) (noting frustration of purpose is an affirmative defense); *Murray E. Gildersleeve Logging Co. v. N. Timber Corp.,* 670 *P.*2d 372, 376 n. 1 (Alaska 1983) (same with respect to impossibility).

purpose elements as applied to the parties' contract and the trial record. During the charge conference, the judge offered the following reasons for issuing a frustration charge to the jurors:

> It's clear to me, and it's clear to me by clear and convincing evidence, that the— this contract was conditioned upon the pool being opened for use. *Now, when we had testimony from Plaintiff's principal, and it was observed by the Court, and I believe significant to the Court, with regard to the clause in the contract, the operative clause that is, you know, of concern, about whether or not services are rendered and payment is made, something to that effect, and I'm paraphrasing, because I don't have the contract in front of me.*
>
> But, as explained by Plaintiff's principal, herself, out of her own mouth, was that it did reasonably seem that this—get paid, you know, whether the pool was used, was, to use her own words, this is a quote, *"rain time."*
>
> And, it seems, that's reasonable, what they're talking about. Not that this pool is down for seven months or four months or one year or something like that.
>
> *So, the Court is satisfied by clear and convincing evidence that the underlying purpose of this contract was conditioned upon the pool being open for use.* Not, like, a couple days, it's raining and you can't—the people can't use the pool, or as the plaintiff's principal indicated, lightning is going on, you can't use the indoor pool because it, you know, is not safe.
>
> So, that's the case, it seems to me. And, the frustration of purpose is exactly what we have here.
>
> At least, enough to charge the jury. They have to make a decision.
>
> [Emphasis added.]

The judge's reference to "rain time" concerns the following trial testimony of Bartilucci:

Q. Okay. Now is there a provision in P–1 that deals with the situation when the pool is closed?

A. Yes. *In our contracts, because we deal with weather issues all the time and we have staff that we have to pay, so in the contract it states that the contract, there'll be no reduction in price in the contract if the pool has to be closed through no fault of JB Pool Management.* So that means that *they'll pay us whether it's thundering and lightning out and we can't open the pool or, and even with an indoor pool you can't have it open during thunder and lightning storms,* so there's times that we did have to close the pool and send the staff home, and that's the standard contract.

Q. Okay. And why is that clause in your contract?

A. Well because we do pay the guards when they're not there. They get paid a certain amount for, *we call it rain time.* We have to still operate the pool, there's still expenses. The contracts, the yearly contract, the expenses for the year are, we break them down into these payments to make it easier for the associations to pay, but like our insurance when the pool's closed, we can't

cancel our insurance, the insurance continues. *We still have expenses we have to pay so,* and that's just standard operating for us.

[Emphasis added.]

Although Bartilucci's testimony certainly provides some evidence about the intent of the parties in allocating the risks of a supervening event that might frustrate the contract's purpose, her testimony is not exhaustive or necessarily conclusive. Notably, none of the association's representatives who testified addressed the intended meaning of the contract language themselves. We also note that the language within the contract's operative paragraph is literally unconditional, declaring that "[t]here will be *no reduction* in charges of the contract amount for *any* closing." (Emphasis added).

The trial judge did not comment explicitly about those words within the contract and attempt to reconcile his analysis with them. Nor did the judge make a finding that the words of the contract provision were ambiguous, or that there was a need to consult parol evidence to determine the parties' intent. *See Driscoll Constr. Co. v. Dep't of Transp.,* 371 *N.J.Super.* 304, 314, 853 *A.2d* 270 (App.Div.2004) (endorsing reference to extrinsic or parol evidence to construe contract terms). These omissions are potentially significant for, as the *Second Restatement* instructs, a party's duties to perform are not discharged under the frustration doctrine where "the [contract] language or the circumstances indicate the contrary." *Id.* at § 265; *see, e.g., Liggett Rest. Grp., Inc. v. City of Pontiac,* 260 *Mich.App.* 127, 676 *N.W.2d* 633 (2003) (declining to apply the frustration doctrine to relieve a vendor of its contractual obligations to provide concessions at a sports facility when the Detroit Lions discontinued their use of the stadium for home games, because an express clause in the parties' contract had addressed that contingency). *See also Second Restatement* § 267(2) and illustration 3 (regarding contractual allocation of risk).

As we have noted, the law generally prohibits "the enforcement of an implied contract or an implied provision that conflicts

or is inconsistent with the parties' express contract[.]" *Kas Oriental Rugs, Inc. v. Ellman,* 394 *N.J.Super.* 278, 287, 926 *A.*2d 387 (App.Div.), *certif. denied,* 192 *N.J.* 74, 926 *A.*2d 858 (2007). On remand, the proofs concerning the mutually intended meaning of the contract's "no reduction" language should be amplified. The trial court should then reexamine its determination in light of those amplified proofs and decide whether the consideration of such extrinsic proofs are warranted to resolve any ambiguity in the contract language.

### D.

Although a remand is necessary for these reasons concerning the frustration doctrine, we discern no basis to disturb the trial court's dismissal of JB Pool's alternative claims for unjust enrichment or quantum meruit recovery. JB Pool should have developed and quantified its proofs on those claims before the first trial. Having failed to do so, it does not deserve a second chance.

■ We also should make clear that the defense of waiver may be presented anew by Four Seasons at the second trial. Because the verdict form utilized by the court unfortunately did not segregate the waiver defense from the frustration defense, we cannot tell whether or not the jury was persuaded by the waiver argument. Hence, the waiver argument may be renewed at the second trial, although this time we suggest that the trial court revise the verdict sheet to set forth appropriate special interrogatories to reveal more clearly the jury's discrete findings on the separate defenses asserted.

### E.

■ As a final matter, we reject JB Pool's appeal of the modest judgment awarded on the counterclaim. Although the counterclaim described the damage to the pool liner as an act of "negligence," that contention was logically subsumed within contract-based principles that an agreement must be performed in a

"reasonably good and workmanlike manner." *Aronsohn v. Mandara*, 98 *N.J.* 92, 98, 484 *A*.2d 675 (1984). There was no need to instruct the jury here on principles of negligence, since the same alleged conduct by JB Pool that damaged the pool liner also would comprise a breach of JB Pool's implied contractual duty to use the pool liner in a workmanlike fashion. Indeed, it might well have confused the jury to have commingled negligence principles and contract principles of law within the same charge. Moreover, Bartilucci presented no testimony to refute the association's claim that JB Pool had damaged the liner. In sum, the court did not commit reversible error in choosing to present the pool liner issues to the jury as a contract matter, rather than as a negligence matter.

Affirmed in part as to the counterclaim, reversed in part, and remanded for additional discovery and a new trial as to JB Pool's contract-based claims and the operative affirmative defenses.