**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-3072-21

LOUISIANA BOIL LLC,
d/b/a THE BOILING HOUSE,
ALDO DEDJA, and
PREMTIM DEDJA,

     Plaintiffs-Appellants,

v.

HORTENSE ASSOCIATES, LP,

     Defendant-Respondent.

_____

Argued December 6, 2023 – Decided December 28, 2023

Before Judges Currier, Firko, and Susswein.

On appeal from the Superior Court of New Jersey, Law Division, Camden County, Docket No. L-2422-20.

Samuel Brad Fineman argued the cause for appellants (Cohen Fineman LLC, attorneys; Samuel Brad Fineman, on the brief).

Todd R. Bartos (Spruce Law Group, LLC) argued the cause for respondent.

PER CURIAM

This appeal arises out of a dispute between a commercial landlord and the guarantors of a tenant's lease obligations during the COVID-19 pandemic. Plaintiffs Louisiana Boil LLC (Louisiana Boil), Aldo Dedja, and Premtim Dedja, his son, (plaintiffs or tenants) appeal from the Law Division's September 24, 2021 order granting defendant Hortense Associates, LP's (defendant or landlord) motion for partial summary judgment dismissing the complaint with prejudice, granting summary judgment on the counterclaim, and an April 29, 2022 consent order stipulating to the amount of damages and entering final judgment for purposes of appeal.[1]  Because we conclude there are no genuine issues of material fact that precluded judgment as a matter of law under Rule 4:46-2(c), we affirm.

## I.

The following material facts are viewed in the light most favorable to plaintiffs as the non-moving parties.  Templo Fuente De Vida Corp. v. Nat'l Fire Ins. Co. of Pittsburgh, 224 N.J. 189, 199 (2016).  The Boiling House was an existing Cherry Hill based seafood-themed restaurant owned by Aldo and

---

[1]  Plaintiffs appeal from the April 29, 2022 consent order insofar as it constituted a final order for purposes of appeal.  They do not challenge the stipulated amount of damages set forth in the consent order or the mitigation of damages provision.

Premtim. They sought to expand the restaurant's "footprint" and "provide greater exposure to promote the brand" in a higher traffic area. On November 4, 2019, Louisiana Boil entered into a forty-nine-page commercial lease with defendant. Premtim[2] was a member of the company and signed the lease on Louisiana Boil's behalf. Aldo and Premtim executed personal guarantees making them jointly and severally liable for rent, additional rent, and debts incurred under paragraph 4 of the lease. The lease was the subject of extensive negotiations between counsel.

Paragraph 3(a) of the lease provided for an initial lease term of ten years. The rental payments were $5,187 per month for the first five years and $5,569.20 for the second five years. The first ten years represented the minimum tenancy. The expected rent commencement date was April 1, 2020. According to the lease terms, Louisiana Boil was also required to pay a proportionate share of the taxes, assessments, and a percentage of its sales as additional rent. The premises were vacant and required interior fix-ups and exterior renovations to convert it to a nautical style restaurant-decor.

---

[2] Parties who share a last name with the other parties are referred to by their first names for the ease of reference. By doing so, we intend no disrespect.

Section 8(i) of the lease provided for a $150,000 tenant improvement allowance (TIA) payable in two $75,000 installments. The renovations included a full demolition, new kitchen, custom walls, seating, furniture, redesigned bar area, new flooring, lighting, plumbing, HVAC system, and a "self-contained submarine." Plaintiffs estimated the improvements would cost in excess of $500,000. They planned to pay for the capital improvements not covered by the TIA with their own funds.

If Louisiana Boil failed to pay rent, the lease provided for payment of late fees and interest. Section 7(a), under "Tenant Default and Landlord's Remedies," defined the non-payment of rent as a default of the lease obligations.

Under the lease, defendant's remedies are cumulative and include acceleration of rent due for the balance of the lease term as set forth in Section 7(a)(4):

> At any time after any Event of Default shall occur, Landlord, at its option, may serve notice upon Tenant that this Lease and the Term hereof shall cease and expire and become absolutely void on the date specified in such notice; and thereupon, and at the expiration of the time limited in such notice, this Lease and the Term, as well as all of the right, title and interest of the Tenant hereunder, shall wholly cease and expire and become void in the same manner and with the same force and effect (except as to Tenant's liability) as if the date fixed in such notice were the date herein specified for expiration of the Term but Tenant shall nevertheless

4

remain liable for the payment of Rent and all other sums due and payable and/or owing by it hereunder, which obligations shall expressly survive the termination of' this Lease. Thereupon, Tenant shall immediately quit and surrender to Landlord the Premises, and Landlord may enter into and repossess the Premises by summary proceedings, detainer, ejectment or otherwise, and remove all occupants thereof and, at Landlord's option, any property thereon without being liable to indictment, prosecution or damage therefor[e].

Defendant's remedies also included filing a lawsuit to collect monies owed and re-entering and/or re-possessing the premises under paragraph 7(a)(2) of the lease.

After the lease was executed, plaintiffs contend they "encountered problems" with defendant over construction permits and a delay in the release of the first $75,000 TIA, which was not paid until late December of 2019. The parties also disagreed about who was responsible for obtaining the permits. Plaintiffs maintained construction delays resulted from defendant requiring them to use its contractor and defendant's construction manager, Joseph Cianfrani, had the contractor stop work on the interior improvement to perform other exterior construction work for defendant. Plaintiffs also contended that defendant required the contractor to obtain interior and exterior permits simultaneously, which delayed completion of construction. They also attribute part of the delay in opening to custom furniture plaintiffs had ordered.

Consequently, plaintiffs contended The Barclay Boiling House was "non-functional" because it lacked a working kitchen, which was essential to operating the restaurant, and the fit-out was never completed. Plaintiffs never had the opportunity to generate income from their new location.

By March 2020, plaintiffs claimed a significant amount of the interior renovations had been completed. However, with the onset of COVID-19 restrictions implemented through Governor Murphy's Executive Orders (EOs), plaintiffs' contended their concept restaurant had to be "scrapped" and "re-imagined at a considerable cost." According to plaintiffs, moving ahead with the original concept "became impossible" due to COVID-19 and "its attendant uncertainties." However, Aldo and Premtim both testified at their depositions that the original restaurant was open and operating during COVID-19.

Beginning in early March 2020, Governor Philip D. Murphy issued a series of EOs to address the COVID-19 pandemic. EO 104 limited the scope of service and hours of operation for restaurants. Exec. Order No. 104 (Mar. 16, 2020), 52 N.J.R. 550(a) (Apr. 6, 2020). Five days later, on March 21, EO 107 was issued, which permitted restaurants and other "dining establishments" to operate their normal business hours but limited the services to food delivery and take-out.

6

Plaintiffs claim they attempted to re-negotiate the lease terms in May 2020, requesting to begin paying rent "when the restaurant is able to open," but defendant was unwilling to accept these terms. Defendant countered at the beginning of the pandemic, it proactively sought to amend the lease to provide for a twelve-month rent abatement and change the rent to "percentage rent" rather than "fixed lease rent." Defendant claims Aldo refused to negotiate an amendment to the lease unless he was removed as a personal guarantor leaving Premtim, who had insufficient assets, as the sole guarantor. Consequently, on May 7, 2020, plaintiffs' attorney sent a lease termination notice to defendant's attorney stating:

> Please be advised that, after careful consideration and in light of the unforeseen and unprecedented effects of COVID-19 on the restaurant business, my client regretfully provides formal notice that it is terminating the subject [l]ease on the grounds of impossibility, frustration of purpose and commercial impracticability.
>
> Given the uncertainty of future space restrictions that will be imposed upon restaurants, including, but not limited to, HVAC modifications, food handling, service rules, customer quotas and the like, my client submits that moving forward as "The [Barclay] Boiling House," a destination-based, eat-in-driven, seafood-themed restaurant is unwise and commercially impracticable now and in the foreseeable future.

7

In response, on May 8, 2020, defendant's attorney informed plaintiffs' attorney that: (1) plaintiffs had no right to attempt to terminate the lease, and (2) plaintiffs were in default under the terms of the lease for their failure to begin paying "minimum rent on April, 2020[,] as required by Section 3(a)(A) of the [l]ease."

On July 10, 2020, defendant's attorney sent another letter to plaintiffs' attorney confirming the continuing default and providing one week—until July 17, 2020—to cure the default through payment of four months' rent owed otherwise litigation would ensue. On July 15, 2020, plaintiffs filed the subject action against defendants seeking a declaratory judgment that the lease is void under the doctrines of impossibility, frustration of purpose, and commercial impracticability, based upon the extant impact of the COVID-19 pandemic on restaurants (count one); alleging breach of contract on the grounds defendant paid the first installment of the TIA in an untimely manner and was primarily responsible for the construction delays (count two); and alleging defendant repeatedly breached the covenant of good faith and fair dealing with respect to its position on the subject lease (count three). Plaintiffs sought declaratory relief, compensatory and punitive damages, and counsel fees.

A-3072-21

Defendant filed an answer and counterclaim to plaintiffs' complaint. In its answer, defendant generally denied the allegations set forth in the complaint and alleged the construction delays were solely caused by plaintiffs' contractors. Defendant cited provisions of the lease pertaining to plaintiffs' agreement to pay rent and additional rent, Tenant's Default and Landlord's Remedies, and the force majeure provision that stated:

> If either party shall be delayed, hindered in or prevented from the performance of any act required hereunder (other than the payment of rent and other charges payable by Tenant) by reason of strikes, lockouts, labor troubles, inability to procure materials, failure of power, riots, insurrection, the act, failure to act or default of the other party, war or any other reason beyond the reasonable control of the party who is seeking additional time for the performance of such act, then performance of such act shall be extended for a reasonable period, in no event to exceed a period equivalent to the period of such delay. No such interruption of any service to be provided by Landlord shall ever be deemed to be an eviction, actual or constructive, or disturbance of Tenant's use and possession of the Premises, the Center or the Property. Nothing in this Section shall be deemed to (i) delay any right of Tenant to terminate this Lease as expressly provided in the Lease unless otherwise noted in the specific termination provision or (ii) delay or excuse Tenant's obligation to pay Rent or other sums due to Landlord under this Lease when required.

Defendant alleged in its answer that the force majeure provision "does not permit termination of the lease and does not excuse tenant's performance of its

A-3072-21

obligations to pay rent." In its counterclaim, defendant alleged plaintiffs were in default from April 1, 2020, to the present and breached the contract (lease) (count one); Aldo and Premtim each executed personal guarantees related to the lease and were liable for the entire damages caused by the tenant (count two); and defendant alleged conversion on the basis the $75,000 TIA was paid to plaintiffs, they converted the funds for their own use, and did not return the funds to defendant (count three).

Following the close of discovery, defendant moved for partial summary judgment on the issue of liability as to the lease. Plaintiffs opposed the motion contending the circumstances caused by COVID-19 made the lease impossible to perform, and the force majeure provision allowed for termination of the lease. Defendant countered the force majeure provision of the lease did not provide for rent abatement or termination of the lease as an option in the event of an unforeseeable event, and Louisiana Boil remained obligated to pay rent. Defendant also maintained that Aldo and Premtim executed personal guarantees, which made them jointly and severally liable for the debts incurred by Louisiana Boil and owed to defendant. On September 24, 2021, the trial court conducted oral argument on the motion and rendered an oral opinion that day granting defendant's motion.

Relying on JB Pool Mgmt. LLC v. Four Seasons at Smithville Homeowners Ass'n., Inc., 431 N.J. Super. 246, 253 (App. Div. 2013), the trial court found the "clear and unambiguous language" of the lease "where performance is prevented for any reason outside the reasonable control of the parties, it will not delay or excuse [plaintiff's] obligation to pay rent or other sums due to [defendant]." The trial court determined the lease and force majeure clause were "unambiguous and enforceable" and rejected plaintiffs' claims asserting the lease should be voided on the grounds of frustration of purpose, impossibility, or impracticability.

In addition, the trial court found plaintiffs did not present evidence of a breach of the duty of good faith and fair dealing, and defendant "had a right to insist upon payment under the lease terms." The trial court dismissed plaintiffs' complaint but noted there were genuine issues of material fact as to the damages defendant was entitled to, which was resolved by entry of the consent order.

On appeal, plaintiffs present the following arguments for our consideration:

> (1) the trial court erred as a matter of law in finding that sufficient and genuine issues of material fact did not exist in granting defendant's motion for partial summary judgment on the issue of liability with respect to the lease;

(2) the trial court failed to analyze plaintiffs' proffered contractual defenses of frustration of purpose, impossibility, and impracticability in light of the COVID-19 pandemic; and

(3) the trial court erred as a matter of law in its interpretation of the force majeure clause in the lease.

We hold that the trial court correctly rejected plaintiffs' proffered contractual defenses of frustration of purpose, impossibility, impracticability, due to the COVID-19 pandemic. We also hold that the trial court properly interpreted the force majeure clause and duly granted defendant's motion for partial summary judgment because there were no disputed issues of material fact on the issue of liability.

II.

We review de novo the grant of summary judgment, applying the same standard as the motion judge. Branch v. Cream-O-Land Dairy, 244 N.J. 567, 582 (2021). That standard requires us to "determine whether 'the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact challenged and that the moving party is entitled to a judgment or order as a matter of law.'" Ibid. (quoting R. 4:46-2(c)). "To decide whether a genuine issue of material fact exists, the trial court must 'draw[] all legitimate inferences

from the facts in favor of the non-moving party.'" Friedman v. Martinez, 242 N.J. 449, 472 (2020) (alteration in original) (quoting Globe Motor Co. v. Igdalev, 225 N.J. 469, 480 (2016)). "[The] trial court's interpretation of the law and the legal consequences that flow from established facts are not entitled to any special deference." Manalapan Realty, L.P. v. Twp. Comm. of Manalapan, 140 N.J. 366, 378 (1995).

"The polestar of contract construction is to discover the intention of the parties as revealed by the language used by them." Karl's Sales & Serv., Inc. v. Gimbel Bros., Inc., 249 N.J. Super. 487, 492 (App. Div. 1991). In order to do so, the language used must be interpreted "'in accord with justice and common sense.'" Ibid. (citing Krosnowski v. Krosnowski, 22 N.J. 376, 387 (1956)). "An agreement must be construed in the context of the circumstances under which it was entered into and it must be accorded a rational meaning in keeping with the express general purpose." Tessmar v. Grosner, 23 N.J. 193, 201 (1957).

Unambiguous language controls the rights and obligations of the parties, even if it was unwise in hindsight. The court will not make a "more sensible contract than the one" the parties made for themselves. Kotkin v. Aronson, 175 N.J. 453, 455 (2003). The parties, especially sophisticated ones like the commercial parties involved in this case, are generally in the best position to

determine their respective needs and obligations in negotiating a contract. Brundage v. Est. of Carambio, 195 N.J. 575, 601 (2008).

A.

The record establishes that there is no material issue of fact concerning the lease provisions. The parties executed a lease for the premises and plaintiffs did not pay the rent owed under the lease. Louisiana Boil breached the lease by not paying rent and additional rent and thereby triggered Aldo and Premtim's obligations under the personal guarantees. The undisputed material facts also demonstrate that plaintiffs bore sole responsibility for obtaining permits, supervising contractors, and fulfilling the required steps to obtain the TIA. Paragraph 2(a) of the lease provides:

> Tenant shall obtain all zoning and use permits and other governmental licenses, permits, and approvals for Tenant's Permitted Use of the Premises and for all signage in connection therewith [...] After the Commencement Date, Tenant shall diligently pursue and deliver to landlord copies of all of the foregoing licenses, permits, and approvals; provided, however, the receipt of the same shall not be an express condition of Tenant's obligations under this Lease.

Plaintiffs did not obtain the permits, and failed to supervise their contractors despite having received a portion of the TIA funds ahead of schedule. Plaintiffs admitted it was their sole responsibility to obtain permits

A-3072-21

and direct and manage the performance of the contractors, in order to be entitled to a portion of the TIA. Defendant paid the TIA. Aldo testified at his deposition that defendant did not require plaintiffs to hire any particular contractors, thus evidencing plaintiffs' control over the project. Based upon our de novo review, we conclude the trial court correctly determined plaintiffs breached the lease and defendant was entitled to damages.

B.

Plaintiffs argue that the trial court failed to consider their proffered contractual defenses of frustration of purpose and impossibility, and their COVID-19 pandemic defense. We are unpersuaded.

Supervening events that make performance of a contract impractical may excuse performance. See M.J. Paquet, Inc. v. N.J. Dep't of Transp., 171 N.J. 378, 389-90 (2002). "A successful defense of impossibility (or impracticability) of performance excuses . . . contract obligations, where performance has become literally impossible, or at least inordinately more difficult, because of the occurrence of a supervening event that was not within the original contemplation of the contracting parties." JB Pool Mgmt., LLC, 431 N.J. Super. at 246. "The supervening event must be one that had not been anticipated at the time the

15

contract was created, and one that fundamentally alters the nature of the parties' ongoing relationship."  Id. at 245.

Both doctrines are concerned with "[a]n extraordinary circumstance [that] may make performance [of a contract] so vitally different from what was reasonably to be expected as to alter the essential nature of that performance." Ibid. (alterations in original) (quoting Restatement (Second) of Conts., ch. 11, intro. note (Am. L. Inst. 1981)).  The doctrine of impossibility or impracticability is not applicable where the difficulty is based on market shifts or the financial inability to perform.  Restatement (Second) of Conts., § 261 cmt. b.

"[U]nder the related doctrine of frustration of purpose," a litigant must prove "the supervening event fundamentally has changed the nature of the parties' overall bargain." JB Pool Mgmt., 431 N.J. Super. at 246.  Frustration of purpose "arises when a change in circumstances makes one party's performance worthless to the other, frustrating his [or her] purpose in making the contract." Id. at 246-47 (quoting Restatement (Second) of Conts., § 265 cmt. a).  "The frustration must be so severe that it is not fairly to be regarded as the risks that [the party invoking the doctrine] assumed under the contract."  Id. at 247. (alteration in original) (quoting Restatement (Second) of Conts., § 265 cmt. a).

Here, there is no evidence in the record to suggest that the COVID-19 EOs frustrated the principal purpose of the lease. We note that plaintiffs are not seeking to be relieved of their obligation to pay rent during the pandemic lockdown when the EOs were in effect. Instead, plaintiffs want to terminate the lease in its entirety. The EOs were temporary in nature and did not fundamentally alter the parties' expectations at the time the lease was executed. Moreover, plaintiffs failed to obtain the necessary permits and complete renovations despite having received TIA funds ahead of schedule.

The six-week delay caused by the COVID-19 lockdown did not frustrate the purpose of the lease or make it impossible for construction to restart. Thus, the trial court correctly determined the equitable doctrines of frustration of purpose, impossibility, and impracticability were not applicable to excuse performance under the lease in the face of the COVID-19 pandemic.

C.

Next, plaintiffs argue the trial court erred as a matter of law in its interpretation of the force majeure clause in the lease. Specifically, plaintiffs contend "with a novel and unprecedented pandemic on the loose, the likes of which have not been seen for over a century," public policy should trigger equitable defenses and apply them to force majeure claims. We disagree.

17

We construe a force majeure clause narrowly. Hess Corp. v. ENI Petroleum US, LLC, 435 N.J. Super. 39, 47 (App. Div. 2014). A party's performance is only excused if the force majeure clause "specifically includes the event that actually prevents a party's performance." Ibid. (quoting Kel Kim Corp. v. Cent. Mkts., Inc., 519 N.E.2d 295, 296 (N.Y. 1987)). Because the force majeure clause in the lease here does not address EOs, government acts, directives, COVID-19, or a pandemic, we are satisfied the trial court correctly upheld the clause. Moreover, such a clause "in a commercial contract between sophisticated parties [is] presumptively reasonable, and the party challenging the clause bears the burden of proving its unreasonableness." Metlife v. Washington Ave. Assoc., L.P., 159 N.J. 484, 496 (1999).

Here, the parties specifically contracted for the occurrence of force majeure events and allocated their risks. The EOs were temporary in nature and did not fundamentally alter the expectations the parties had when the ten-year lease was executed. The trial court found plaintiffs presented no evidence to demonstrate the unreasonableness of the force majeure clause. We see no support for plaintiffs' interpretation of the force majeure clause serving as a basis to terminate the lease due to the pandemic. The trial court's factual findings concerning the force majeure clause are grounded in substantial credible

A-3072-21

evidence in the record and its conclusions of law are appropriate. <u>Rova Farms Resort, Inc. v. Investors Inc. Co.</u>, 65 N.J. 474, 483-84 (1974). Under the lease and the force majeure clause, plaintiffs agreed to pay rent regardless of circumstances beyond their control.

Courts give effect to a party's absolute obligation to pay rent in accordance with the contract terms. <u>Marini v. Ireland</u>, 56 N.J. 130, 143 (1970) (noting "[it] is not the province of the court to make a new contract or to supply any material stipulations or conditions which contravene the agreements of the parties."). This is a risk plaintiffs assumed under the lease. For that reason, defendant was entitled to judgment as a matter of law as to liability.

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-3072-21