ABRAHAM DUFF, PLAINTIFF-RESPONDENT, v. TRENTON BEVERAGE COMPANY, DEFENDANT-APPELLANT.

Argued April 17, 1950—Decided May 22, 1950.

*Mr. David Stoffer* argued the cause for appellant. *Mr. Joseph M. Jacobs* on the brief. *Messrs. Stoffer & Jacobs,* attorneys.

*Mr. Nathan Duff* argued the cause for respondent.

The opinion of the court was delivered by

HEHER, J. The question at issue here is the existence and legal sufficiency of an oral contract of sale by defendant to plaintiff of 118 cases of Ron Rico rum. Plaintiff was awarded damages for non-delivery of the merchandise. The Appellate Division of the Superior Court affirmed the judgment; and we certified the cause for appeal on the petition of defendant.

Plaintiff held a plenary retail consumption liquor license and defendant a plenary wholesale liquor license issued by the respective local and state authorities under the State Alcoholic Beverage Control Act. *R. S.* 33:1–1 *et seq.* The subject matter of the contract of sale, so it is alleged, consisted of 32 cases of Siboney rum and 118 cases of Ron Rico rum, all sold at the price of $22.50 per case. Plaintiff's proofs tended to show that the contract was made March 1, 1948. On March 17th following, the stated quantity of Siboney rum was delivered, and shortly thereafter payment was made at the stipulated rate. The complaint alleges that on the ensuing May

17th defendant refused plaintiff's demand for delivery "of the balance of the merchandise purchased," and that injury resulted to plaintiff. The answer admitted the executed sale of the Siboney rum, but denied the making of a contract for the sale of Ron Rico rum. The Statute of Frauds was pleaded; and at the pretrial conference the answer was amended to allege that the "agreement of sale" was in violation of Regulation 34 of the Division of Alcoholic Beverage Control, providing that no manufacturer or wholesaler shall sell to a retailer "any alcoholic beverage other than malt beverages except at the wholesale price established in accordance with rules one and two" thereof, less the allowable discount. It was stipulated that, at the date of the alleged contract, the established price of Ron Rico rum was $43.04 per case.

The denial of defendant's motion for judgment is assigned for error.

Although of the view that the whole agreement was concluded in one "conversation" between plaintiff and defendant's president, the trial judge submitted to the jury the question of whether there were two separate and independent contracts, with the instruction that, if there were two contracts, "the second would have to be in writing," and if there was but one contract, there was part performance which would rule out the plea of the Statute of Frauds. *R. S.* 46:30–10. The Appellate Division was also of the view that the validity of this defense depended upon whether "the contract was made at one and the same time or whether it consisted of two separate independent agreements," and that the proofs in that regard raised an issue of fact for the jury. As to Regulation 34 of the Division of Alcoholic Beverage Control, the Appellate Division deemed it incumbent upon the defendant under the contract found by the jury to seek the consent of the administrative authority to the sale of the Ron Rico rum at less than the established price, and, not having done so, the motion for judgment on this ground was not maintainable. In a word, the court concluded that the contract found by the jury did not have the taint of illegality; that the "issu-

ance of the necessary permit to defendant was not an impossibility, as is evidenced by the authorization of the sale" of the Siboney rum; and that the "defense of legal impossibility" is not available to excuse defendant's "nonperformance as long as it was within" its "power to remove that obstacle to performance, in the absence of a showing of a *bona fide* attempt or effort to perform." The principle invoked was that one who "agrees to do an act should do it, unless absolutely impossible," applied in *School Trustees of Trenton v. Bennett,* 27 *N. J. L.* 513 (1859).

It is the insistence of plaintiff that a contract for the sale of intoxicating liquor at less than the price established under Regulation 34 of the administrative agency does not constitute an illegal bargain, if conditioned on the approval of that authority, and that it is to be presumed, in the absence of evidence *contra,* that if defendant had made application to the authority, the permit would have been granted. On this hypothesis, it is urged that defendant here is answerable in damages as if the condition were met.

The Alcoholic Beverage Law was enacted in 1933. *P. L., p.* 1180, *c.* 436, *R. S.* 33 :1–1 *et seq.* Thereby, a State Department of Alcoholic Beverage Control was established for the supervision, by a Commissioner designated as its chief executive, of "the manufacture, distribution and sale of alcoholic beverages in such a manner as to promote temperance and eliminate the racketeer and bootlegger." *Section 3.* The Commissioner was authorized and empowered, *inter alia,* "to make such general rules and regulations and such special rulings and findings as may be necessary for the proper regulation and control of the manufacture, sale and distribution of alcoholic beverages and the enforcement" of the act, "in addition thereto, and not inconsistent therewith," and to "alter, amend, repeal and publish the same from time to time." *Section 36* as amended by *ch.* 154 of the *Laws of* 1943, *N. J. S. A.* 33 :1–39. By a supplement adopted in 1939 (*P. L., p.* 174, *c.* 87; *N. J. S. A.* 33 :1–89 *et seq.*), it was made "unlawful for any manufacturer, wholesaler, or other

person privileged to sell to retailers to discriminate in price, directly or indirectly, between different retailers purchasing alcoholic beverages other than malt beverages bearing the same brand or trade name and of like age and quality." *Section* 1. To the same end, discrimination in granting discounts, rebates, free goods, allowances or inducements, was forbidden. *Section* 2. Violation of the act was made punishable by fine or imprisonment, or both. *Section* 4. And the Commissioner was empowered to promulgate such rules and regulations "as will assist in properly supervising the liquor industry and promoting temperance," in relation to (a) maximum discounts, rebates, free goods, allowances and other inducements to retailers by manufacturers, wholesalers and other persons privileged to sell to retailers; (b) gifts and deliveries of money, products and other things of value by manufacturers, wholesalers, [or] other persons privileged to sell to retailers, directly or indirectly through stockholders, directors, officers or employees; (c) maintenance and publication of invoice prices, discounts, rebates, free goods, allowances and other inducements; and (d) such other matters as may be necessary to fulfil the restrictions embodied in the act. *Section* 5. The policy of the act is expounded in the preamble. It recites a legislative finding that the practice of granting discounts, rebates, and so on, by manufacturers and wholesalers to retailers has "contributed largely to destructive price wars which have unduly increased the consumption of alcoholic beverages," and is "detrimental to the proper operation of the liquor industry and contrary to the interests of temperance;" and that the sale of alcoholic beverages "is unusually susceptible to abuse with resulting danger to the general public and should be strictly supervised and regulated to prevent undue stimulation of public demand for alcoholic beverages."

The current Regulation 34 was promulgated by the administrative authority pursuant to the power thereby granted. Rule 4 thereof enjoins the sale of alcoholic beverages by a manufacturer or wholesaler to a retailer "except at the whole-

sale price established" in accordance with Rules 1 and 2, less permissible discounts. Rules 1 and 2 required the filing with the administrative agency on or before March 10, 1945, of a "complete list of wholesale prices and statement of discounts," and provides for "changes in wholesale prices and discounts * * * by filing on or before the 10th day of any month a statement of the changes which shall take effect on the 1st day of the following month." Compliance with this provision is a condition prerequisite to lawful sales of alcoholic beverages. These statements are made available for inspection by manufacturers and wholesalers; and there is provision for an amendment of the "filed price list and statement of discounts in order to meet lower and competing prices and discounts for" comparable alcoholic beverages filed pursuant to the regulation by any other manufacturer or wholesaler, provided the amended prices and discounts "are filed before 5:00 P. M. of the 14th day of the month, and provided further, that such amended prices are not lower and discounts not greater than those to be met." There is provision also for the publication by the Commissioner of the price lists and discount statements "not later than three days before the 1st day of each month." Rule 2(e) reserves to the Commissioner the power, "upon adequate cause being shown therefor," to "suspend the foregoing provisions so as to permit wholesale prices and discounts and changes in such prices and discounts, to take effect upon such shorter notice as he may prescribe."

The intention of the parties controls in the making and in the construction of contracts. The parties may make contractual liability dependent upon the performance of a condition precedent; and where the performance of the condition made vital to the existence of the contract is impossible as in violation of public policy, a contractual obligation does not come into being. Generally, no liability can arise on a promise subject to a condition precedent until the condition is met. Where the promisor assumes the risk of impossibility, the promise is absolute and not conditional. *Middlesex Water Co. v. Knappmann Whiting Co.*, 64 *N. J. L.* 240 (*E. & A.*

1900); *Gouled v. Holwitz*, 95 *N. J. L.* 277 (*Sup. Ct.* 1921); *Williston on Contracts* (*Rev. Ed.* 1936), §§ 1933, 1935, 1970; *Restatement, Contracts,* § 301, 295. There is a fundamental distinction between a condition and a covenant. A condition in a promise limits the undertaking of the promisor to perform, either by confining the undertaking to the case where the condition happens, or to the case where it does not happen. By its very nature, a conditional promise becomes absolute only upon performance of the prescribed condition. Both futurity and uncertainty are ordinarily the elements of a condition of this class. If to the knowledge of the parties, the event has either already happened or cannot possibly happen, the promise is either absolute or nugatory from the outset. And this is true whether the parties are aware of the facts or not. *Williston on Contracts* (*Rev. Ed.*), § 663.

Ordinarily, a promise to do a thing not in itself unlawful is binding even though for some unforeseen reason performance becomes impossible, unless the risk of supervening impossibility is refused by the promisor. *Middlesex Water Co. v. Knappmann Whiting Co., supra.* Yet even where the promise is absolute in terms, a condition may be implied in the promise, depending upon the nature of the performance and the circumstances. The basis of the defense of impossibility is the presumed mutual assumption when the contract is made that "some fact essential to performance then exists, or that it will exist when the time for performance arrives. The only evidence, however, of such mutual assumption is, generally, that the court thinks a reasonable person, that is, the court itself, would not have contemplated taking the risk of the existence of the fact in question." *Williston on Contracts* (*Rev. Ed.* 1936), § 1937. The inquiry is whether the contingency "is of such a character that it can reasonably be implied to have been in the contemplation of the parties at the date when the contract was made." Per Lord Parmoor in *Metropolitan Water Board v. Dick* (1917), 2 *K. B.* 1, 8; affirmed (1918), *A. C.* 119. In *Horlock v. Beal* (1916), 1 *A. C.* 486, 512, Lord Shaw said: "The underlying ratio

is the failure of something which was at the basis of the contract in the mind and intention of the contracting parties." And in *Tamplin S. S. Co. v. Anglo-Mexican Petroleum Co.* (1916), 2 *A. C.* 397, 403, Earl Loreburn considered the true principle to be, applicable also to commercial contracts, whether it is inferable from the nature of the contract that "a condition which is not expressed was a foundation on which the parties contracted." *Vide Gouled v. Holwitz, supra; Dexter v. Norton,* 47 *N. Y.* 621 (1871) ; *Taylor v. Caldwell,* 3 *Best & S.* 826, 6 *Eng. Rul. Cas.* 603.

The technicians have classified impossibility as objective, where it is due to the nature of the performance, and subjective, where it is the result of the incapacity of the promisor. Objective impossibility is ordinarily a complete defense, unless the risk is assumed by the promisor rather than the promisee and the thing to be done is not illegal. Where the parties are cognizant of the facts, but in error entertain the belief that known difficulties are not insuperable, and are not merely the result of the promisor's subjective incapacity, there can be no liability, subject to the stated qualification. *Williston on Contracts (Rev. Ed.),* § 1933. In *Anglo-Russian Merchant Traders v. John Batt & Co.* (1917), 2 *K. B.* 679, there was a contract for the sale of aluminum, both parties knowing that export of the metal was prohibited unless licensed by the government. The seller's efforts to secure a license were fruitless. He was held not liable. Viscount Reading, C. J., held that "the implied obligation is no higher than that the sellers shall use their best endeavours to obtain a permit," and that if it were an absolute obligation on the sellers to ship the aluminum or, if they could not do so, to pay damages, it would be contrary to the law of England, which prohibited the export of the metal except under a license. And in *McKenna v. McKenna,* 15 *Can. S. Ct.* 311 (1888), the defendants engaged the plaintiffs as subcontractors to do certain government work. Both parties knew the government had cancelled the contract with the defendants, but the defendants believed they could procure a reinstatement

of the contract. In this, they failed. Liability was denied. Ritchie, C. J., said: "Reading the contract in the light of the surrounding circumstances I think what both parties contemplated was, an agreement based on the restoration of the contract to McNamee, which both parties thought would be obtained through their united efforts and influence; failing in this the contract necessarily fell through, because, without the fault of either party, it could be fulfilled by neither, it not, in my opinion, being contemplated that any liability should arise on either side until the restoration should be obtained through their joint endeavors. If the contract was restored then the agreement became capable of fulfillment but not before; in other words, conditional on the restoration of the contract. The government having refused without the fault of either party, the non-fulfillment of the agreement happened without fault on either side. This was not a contract the performance of which was dependent on the continued existence of a given state of things, but the opposite, the performance was dependent on the action of the Government of British Columbia over which neither party had any control."

Here, there was no intentional assumption of the risk. As related by plaintiff, contractual liability was expressly made to depend upon the approval of the sale by the administrative authority. A contractual obligation to sell did not come into being. The sale was impossible in law. An engagement by the seller to obtain a permit for the sale from the administrative agency or, failing that, to pay damages, would constitute an absolute obligation to sell; and an absolute undertaking to sell in violation of the price regulation could not be enforced. *Anglo-Russian Merchant Traders v. John Batt & Co., supra.* The act made the condition precedent to the existence of a contract was beyond the province of the administrative agency. An agreement to do or to induce the doing of an illegal act is unenforceable.

The undertaking, according to plaintiff's version, was to sell the merchandise at less than the established price.

This would result in price discrimination beyond the power of the administrative authority to ratify. Price control to serve the common interest is a permissible exercise of the police power where the business is affected with the public interest; but it is a fundamntal requirement that the regulation be reasonable and uniform in its operation and effect and not arbitrary or capricious. An arbitrary and discriminatory exception to the general rule formulated by the administrative agency to serve the statutory policy would constitute an unwarranted interference with individual liberty of contract. There cannot be individual deviations at variance with the legislative policy and destructive of the end to be served. It is axiomatic that the exertion of governmental authority in this field cannot be deemed reasonable if it is discriminatory. *Nebbia v. New York*, 291 *U. S.* 502, 54 *S. Ct.* 507, 78 *L. Ed.* 940 (1934), 89 *A. L. R.* 1469; *Old Dearborn Distributing Co. v. Seagram-Distillers Corporation*, 299 *U. S.* 183, 57 *S. Ct.* 139, 81 *L. Ed.* 109 (1936), *A. L. R.* 1476; *State Board of Milk Control v. Newark Milk Co.*, 118 *N. J. Eq.* 504 (*E. & A.* 1935).

Price regulation is essentially a legislative function. Here, the primary policy was declared by the Legislature. Price control was deemed requisite to avoid the destructive price wars which had unduly increased the consumption of alcoholic beverages and were therefore deemed inimical to the "interests of temperance." Price discrimination was made unlawful and punishable as a criminal offense. The execution of the policy was committed to the administrative agency; and to that end the Commissioner was empowered to promulgate appropriate rules and regulations which would have the force of law. Obviously, a rule that would permit arbitrary exceptions and discriminations would subvert the policy of the law. It would seem to be elementary that the administrative authority is not vested with unlimited discretion; it is restrained by the principle of the statute, and by the means and methods provided for its execution. The law was laid down by the Legislature. The administrative function is to

execute the law; and executory action forbids the exercise of arbitrary power. Arbitrary power is alien to our constitutional system. Unless the administrative officer be restrained by a definite, uniform rule of action, the regulation falls as a grant of arbitrary power in violation of the Fourteenth Amendment of the Federal Constitution. If not thus circumscribed, it lends itself to invidious distinctions, depending upon mere will rather than the exercise of a discretion designed to effectuate the indicated legislative policy. The confinement "must be such as to preclude oppression and insure impartial execution." *Librizzi v. Plunkett,* 126 *N. J. L.* 17 (*Sup. Ct.* 1940). The principle is expounded in *Yick Wo v. Hopkins,* 118 *U. S.* 356, 6 *S. Ct.* 1064, 30 *L. Ed.* 220 (1886). This is the precept that also determines whether the delegation of power is legislative or administrative merely. *Van Riper v. Traffic Telephone Workers' Federation of New Jersey,* 2 *N. J.* 335 (1949); *State Board of Milk Control v. Newark Milk Co., supra.*

Thus it is that the enforcement of the contract alleged by plaintiff and found by the jury would constitute price discrimination within the peremptory ban of the statute and the rules and regulations adopted to enforce the statutory policy; and it was therefore not within the province of the administrative agency to sanction the sale. The performance of the promise would be in contravention of public policy; and the promise is therefore without contractual efficacy. Breach of an undertaking to induce the doing of an act contrary to law cannot be the foundation of an action for damages.

 Rule 2(e) of the administrative agency has no application. It is designed "to permit wholesale prices and discounts and changes in such prices and discounts" to become effective on "such shorter notice" as the administrator may prescribe, if "adequate cause" therefor be shown. The rule has reference to the time schedule only. It was not intended to be a vehicle of discrimination. It cannot be presumed that if application had been made to that authority, the permit would have been granted, for such action would contravene

the law. The contrary doctrine would afford a ready means of frustrating the statutory policy. The manufacturer or wholesaler could agree to apply for a permit for a discriminatory sale and, by not making the application, render the agreement enforceable. All other manufacturers and wholesalers, as well as the general public, have an interest in the maintenance of the price schedule. There can be a change of price only in the manner and upon the notice prescribed by the rules.

The judgment is reversed, and the cause is remanded with direction to enter judgment for defendant.

*For reversal*—Chief Justice VANDERBILT, and Justices HEHER, OLIPHANT and BURLING—4.

*For affirmance*—Justices CASE and WACHENFELD—2.