**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-2525-23

MAGYAR BANK,

    Plaintiff-Respondent,

v.

MAURO MOTORS, INC., ESTATE
OF CECELIA A. MAURO, CECELIA
M. MAURO, as guardian ad litem for
CECELIA A. MAURO, ANGELO
MAURO, JR., and JOSEPH MAURO,

    Defendants-Appellants.

_____

Submitted May 14, 2025 – Decided July 3, 2025

Before Judges Marczyk and Torregrossa-O'Connor.

On appeal from the Superior Court of New Jersey, Law Division, Middlesex County, Docket No. L-0350-19.

Ferrara Law Group, PC, attorneys for appellants (Ralph P. Ferrara and Aaron L. Peskin, of counsel and on the briefs).

Sherman Atlas Sylvester & Stamelman, LLP, attorneys for respondent (Anthony J. Sylvester and Craig L. Steinfeld, of counsel and on the brief).

PER CURIAM

Defendants Mauro Motors, Inc., the Estate of Cecelia A. Mauro, Angelo Mauro, Jr., Cecelia M. Mauro, and Joseph Mauro appeal from the trial court's March 8, 2024 order denying their motion to modify their Settlement Agreement with plaintiff Magyar Bank. Defendants argue the defense of impossibility should excuse them from their obligations under the Settlement Agreement, and the trial court erred in refusing to modify the Settlement Agreement. Defendants also argue the trial court erred in refusing to approve the sale of a property to satisfy their obligation under the Settlement Agreement, which plaintiff rejected due to the sale being set for a date past the payment deadline established in the agreement. Following our review of the record and the applicable legal principles, we affirm.

I.

Defendants took out a loan for $2.9 million from plaintiff in 2017, cross-collateralized by several properties owned by defendants. Plaintiff subsequently sued due to defendants' default under the loan. Plaintiff also initiated three mortgage foreclosure actions. On January 30, 2023, the parties appeared for

2

trial but were able to resolve the case.[1]  At the time of trial, the amount due on the loan was $5,103,067.66.

The language of the Settlement Agreement was negotiated over several months and finally memorialized on April 14, 2023.  The Settlement Agreement provided that defendants were required to pay plaintiff $3.65 million by October 14, 2023, or $3.75 million by January 14, 2024, if they missed the October deadline.  Under the Settlement Agreement, plaintiff and defendants also executed a consent order and final judgment on May 16, 2023, which entered judgment in favor of plaintiff against defendants for the full amount of the outstanding loan ($5,103,067.66).

The Settlement Agreement further provided that plaintiff agreed to forbear the consent judgment so long as defendants paid the agreed-upon amount by either deadline.  If defendants failed to pay the agreed-upon amount by the January 2024 deadline, they would be responsible for the full amount of the consent judgment.  Under paragraph 6(g) of the agreement, defendants' discounted payment in satisfaction of the loan obligation was "expressly conditioned upon timely receipt of all payments."

---

[1] Certain defendants asserted counterclaims against plaintiff.  These claims were dismissed under the Settlement Agreement.

A-2525-23

Paragraph 6(a) of the Settlement Agreement provided that defendants "shall attempt to sell" four properties in order to raise the money to satisfy defendants' financial obligations. The location and respective values of the properties referenced in the Settlement Agreement, at the time of its execution, were as follows: 200 Mawbey Street, Woodbridge (Woodbridge property), $423,000; 776 North Drive, Brick (Brick property), $1,338,900; and two properties in Colts Neck, one at 18 Princeton Lane, (18 Princeton Lane property) $2,590,000, and another at 22 Princeton Lane, (22 Princeton Lane property) $995,000. Paragraph 6(a) also required defendants to deliver to plaintiff "all net proceeds from the sales of each . . . [property] as such sales occur and such proceeds [were] received," and required defendants to provide plaintiff with "status reports" regarding the sale of any properties.

Defendants were also required under the agreement to provide plaintiff with deeds in lieu of foreclosure for all the properties to be held in escrow, and if defendants failed to pay, plaintiff had the right to record the deeds and pursue collection and execution of the consent judgment for the full $5,103,067.66, less any amounts actually received by plaintiff. Importantly, paragraph 6(f) of the Settlement Agreement provided that defendants were not required to pay plaintiff through the sale of their properties. The Settlement Agreement stated:

> Notwithstanding anything contained in . . . paragraph 6 regarding the sales of the . . . [p]roperties, [defendants] shall be permitted to pay . . . [plaintiff] . . . through sales of the . . . [p]roperties, refinance of the . . . [p]roperties or any other means so long as timely payment of the full amount of either the [October 2023 deadline amount] or [the January 2024 deadline amount] is made within the timeframes set forth in . . . paragraph 6.

At the time of the execution of the Settlement Agreement, defendants had listed the two Colts Neck properties for sale. On June 23, 2023, defendants sold the 18 Princeton Lane property for $2.2 million and provided $2,057,99.13 in sale proceeds to plaintiff. After the sale of the 18 Princeton Lane property, defendants still owed $1,592,000.87 ($3,650,000 minus $2,057,999.13), if they met the October 14, 2023 deadline.

The Brick property was Angelo's[2] residence which suffered damage caused by a storm in April 2023 and needed repairs. In July 2023, plaintiff's counsel reached out to defendants' counsel for a status update on the sale of the properties, to which defendants' counsel responded that the Brick property "just had all repairs completed" and would "be listed shortly" for approximately

---

[2] Because defendants share the same last name, we refer to them by their first names to avoid confusion. We intend no disrespect in doing so.

A-2525-23

$1,500,000. Defendants assert the Brick property was listed for sale, but could not be shown because of Angelo's subsequent health issues.

In September 2023, Angelo was diagnosed with congestive heart failure and underwent surgery. He continued to have cardiac related issues and his physician advised the court in January 2024 that he would "likely" require a heart transplant in the future. Because of his health issues his physician reported his "functional status remain[ed] very limited" and that he was "mostly homebound with restricted mobility." The physician advised the trial court it would be detrimental to Angelo's health to require him to vacate his home. Defendants never notified plaintiff of Angelo's health-related issues until defendants filed their motion to modify the Settlement Agreement on January 12, 2024, on the eve of the second and final January 14 deadline.

Meanwhile, the October 14, 2023 deadline passed, and defendants then owed $1,692,000.87 ($3,750,000 minus $2,057,999.13) by January 14, 2024. Plaintiff's counsel emailed defendants' counsel on October 17 requesting updates on the sales of the three remaining properties and expressly stated the remaining balance was still due on January 14, 2024. It was not until November 27, 2023, that defendants responded and presented plaintiff's counsel with a copy of a proposed contract for the 22 Princeton Lane property, with a sales price of

6

$825,000, $170,000 less than the estimated value at the time of settlement. Plaintiff advised defendants' counsel it would approve the sale provided the net proceeds were paid and the sale closed prior to January 14, 2024. However, the buyer backed out on December 1, and defendants notified plaintiff of the cancellation on December 4 via email.

On December 11, 2023, defendants' counsel sent plaintiff's counsel a new proposed contract for the sale of the 22 Princeton Lane property for a sales price of $790,000. The contract called for a sixty-day due diligence period with closing to take place thirty days thereafter, thus contemplating a closing date after the January 14, 2024 deadline. Plaintiff advised defendants' counsel via email on December 13, 2023, that it would approve the sale, but subject to payment of the net proceeds and the sale closing prior to January 14, 2024. Defendants' counsel responded the same day, confirming closing would not occur by January 14, and that defendants needed plaintiff to confirm whether it approved the contract. On December 18, plaintiff declined to approve the contract in an email sent to defendants' counsel due to their inability to comply with the Settlement Agreement. The contract was never approved.

By letter dated January 12, 2024, plaintiff's counsel reminded defendants' counsel of the January 14, 2024 deadline (extended to January 16 by virtue of

A-2525-23

the weekend and holiday) for full payment of the discounted payoff amount and that if payment of the remaining $1,692,000.87 was not received by the January 16 deadline, defendants would be obligated to plaintiff for the full amount of the loan less the net proceeds received from the sale of the 18 Princeton Lane property. The letter also advised if payment was not received by January 16, commencing on January 17, 2024, plaintiff would exercise their rights under the Settlement Agreement, including recording the deeds in lieu of foreclosure and docketing and enforcement of the consent judgment.

Defendants then moved to modify the Settlement Agreement on January 12, 2024. Defendants sought an additional four months to fund the settlement amount of $3,750,000, as well as court approval for the sale of the 18 Princeton Avenue property.[3] On March 8, 2024, following oral argument, the court issued an order and accompanying written decision denying defendants' motion.

## II.

Defendants argue the trial court erred in refusing to modify the Settlement Agreement because multiple events rendered performance impossible. They

---

[3] Because defendants did not deliver the remaining $1,692,000.87 balance of the $3,750,000 payoff amount by the January 16 deadline or any time thereafter, plaintiff recorded deeds in lieu of foreclosure on the Woodbridge property, the Brick property, and the 22 Princeton Lane property. Plaintiff's subsidiary is now in possession or control of the three properties.

8

further assert the court erred in refusing to permit the sale of the 22 Princeton Lane property.

"A settlement agreement between parties to a lawsuit is a contract." Nolan v. Lee Ho, 120 N.J. 465, 472 (1990). The construction and interpretation of a settlement agreement is a matter of law and is subject to de novo review on appeal. Kaur v. Assured Lending Corp., 405 N.J. Super. 468, 474 (App. Div. 2009); see also Manahawkin Convalescent v. O'Neill, 217 N.J. 99, 115 (2014) ("When a trial court's decision turns on its construction of a contract, appellate review of that determination is de novo."). We "give 'no special deference to the trial court's interpretation and look at the contract with fresh eyes.'" Manahawkin Convalescent, 217 N.J. at 115 (quoting Kieffer v. Best Buy, 205 N.J. 213, 223 (2011)).

"[T]he settlement of litigation ranks high in our public policy," and we "strain to give effect to the terms of a settlement wherever possible." Brundage v. Est. of Carambio, 195 N.J. 575, 601 (2008) (first quoting Jannarone v. W.T. Co., 65 N.J. Super. 472, 476 (App. Div. 1961); and then quoting Dep't of Pub. Advoc., Div. of Rate Couns. v. N.J. Bd. of Pub. Utils., 206 N.J. Super. 523, 528 (App. Div. 1985)). "Our strong policy of enforcing settlements is based upon 'the notion that the parties to a dispute are in the best position to determine how

to resolve a contested matter in a way which is least disadvantageous to everyone.'" Ibid. (quoting Peskin v. Peskin, 271 N.J. Super. 261, 275 (App. Div. 1994)).

The interpretation of a settlement agreement is "governed by basic contract principles." Capparelli v. Lopatin, 459 N.J. Super. 584, 603 (App. Div. 2019). "'[A]bsent a demonstration of fraud or other compelling circumstances,' a court should enforce a settlement agreement as it would any other contract." Id. at 603-04 (quoting Jennings v. Reed, 381 N.J. Super. 217, 227 (App. Div. 2005)). "[C]ourts enforce contracts based on the intent of the parties, the express terms of the contract, surrounding circumstances and the underlying purpose of the contract." In re Cnty. of Atlantic, 230 N.J. 237, 254 (2017) (quoting Manahawkin Convalescent, 217 N.J. at 118). "A reviewing court must consider contractual language 'in the context of the circumstances' at the time of drafting . . . ." Ibid. (quoting Sachau v. Sachau, 206 N.J. 1, 5-6 (2011)). "[W]hen the intent of the parties is plain and the language is clear and unambiguous, a court must enforce the agreement as written, unless doing so would lead to an absurd result." Capparelli, 459 N.J. Super. at 604 (quoting Quinn v. Quinn, 225 N.J. 34, 45 (2016)). As with the interpretation of any other contract, a court shall not rewrite a settlement agreement "to provide a better bargain than contained

in [the] [parties'] writing." Kaur, 405 N.J. Super. at 477 (first alteration in original) (quoting Grow Co., Inc. v. Chokshi, 403 N.J. Super. 443, 464 (App. Div. 2008)).

"Impossibility or impracticability of performance are complete defenses where a fact essential to performance [of a contract] is assumed by the parties but does not exist at the time for performance." Connell v. Parlavecchio, 255 N.J. Super. 45, 49 (App. Div. 1992). "Even if a contract does not expressly provide that a party will be relieved of the duty to perform if an unforeseen condition arises that makes performance impracticable, 'a court may relieve him of that duty if performance has unexpectedly become impracticable as a result of a supervening event.'" Facto v. Pantagis, 390 N.J. Super. 227, 231 (App. Div. 2007) (quoting Restatement (Second) of Contracts § 261 cmt. a (Am. L. Inst. 1981)). "The basis of the defense is 'the presumed mutual assumption when the contract is made that some fact essential to performance then exists, or that it will exist when the time for performance arrives.'" Petrozzi v. City of Ocean City, 433 N.J. Super. 290, 303 (App. Div. 2013) (quoting Duff v. Trenton Beverage Co., 4 N.J. 595, 605 (1950)). Thus, the inquiry "is whether the condition 'is of such a character that it can reasonably be implied to have been in the contemplation of the parties at the date when the contract was made.'"

Ibid. (quoting Duff, 4 N.J. at 605). "[T]he parties must not have reasonably foreseen the change that rendered the contract performance impossible or impracticable." Ibid. As the Restatement explains:

> Where, after a contract is made, a party's performance is made impracticable without his fault by the occurrence of an event the non-occurrence of which was a basic assumption on which the contract was made, his duty to render that performance is discharged, unless the language or the circumstances indicate the contrary.
>
> [Restatement (Second) of Contracts, § 261.]

And as this court summarized:

> A successful defense of impossibility (or impracticability) of performance excuses a party from having to perform its contract obligations, where performance has become literally impossible, or at least inordinately more difficult, because of the occurrence of a supervening event that was not within the original contemplation of the contracting parties.
>
> [JB Pool Mgmt., LLC v. Four Seasons at Smithville Homeowners Ass'n, Inc., 431 N.J. Super. 233, 246 (App. Div. 2013).]

"The supervening event must be one that had not been anticipated at the time the contract was created, and one that fundamentally alters the nature of the parties' ongoing relationship." Id. at 245. The doctrine is "concerned with '[a]n extraordinary circumstance [that] may make performance [of a contract] so

vitally different from what was reasonably to be expected as to alter the essential nature of that performance." Ibid. (alterations in original) (quoting Restatement (Second) of Contracts ch.11, intro. note at 309). Even where a party "is excused from performance as a result of an unforeseen event that makes performance impracticable, the other party is also generally excused from performance," and thus the party claiming impracticability "cannot demand something for nothing from the other party." Facto, 390 N.J. Super. at 233-34 (quoting 14 James P. Nehf, Corbin on Contracts § 78.2 (Joseph M. Perillo, rev. ed. 2001)).

A.

Defendants rely on JB Pool to assert "performance ha[d] become literally impossible, or at least inordinately more difficult, because of the occurrence of a supervening event that was not within the original contemplation of the . . . parties," and "fundamentally alter[ed] the nature of the parties' . . . relationship." 431 N.J. Super. at 245-46. They also rely on Facto, to argue "performance ha[d] unexpectedly become impracticable as a result of a supervening event." 390 N.J. Super. at 231 (quoting Restatement (Second) of Contracts § 261 cmt. a). Defendants also rely Villanueva v. Amica Mutual Insurance Co., to assert this court should have modified the Settlement Agreement in the interests of fairness and equity. 374 N.J. Super. 283, 288 (App. Div. 2005).

Defendants argue the court erred in finding they could fulfill their obligations under the Settlement Agreement from sources other than the sale of the four properties, because the Settlement Agreement "expressly contemplated" the sale of such properties. They claim the Settlement Agreement mandated them to attempt to sell the properties. They further assert we must view the contract as a whole and find the intention of the Settlement Agreement "required [them] to market and sell the properties" and revolved around the sale of real estate for satisfaction.

Defendants contend the Brick property required repairs from the hurricane, and Angelo developed his health issues once the repairs were completed. They assert these "two supervening events" made performance under the Settlement Agreement impossible, and fairness and equity should have compelled the trial court to give them "more time to account for these supervening events."

Plaintiff counters the court cannot fashion a better contract for the parties than the one they entered but instead should focus on the intention of the parties. It asserts defendants' unilateral request to modify the Settlement Agreement to provide them with more advantageous terms than originally agreed upon would be solely for defendants' benefit and to plaintiff's detriment. Plaintiff points out

14

defendants "fully benefited from the Settlement Agreement" as they had an opportunity to satisfy their debt at a discounted rate, provided payment was made by either the October 2023 or January 2024 deadlines.

Plaintiff asserts the consequences of defendants' failure to pay by the deadline and their purported difficulties in selling the Brick property due to Angelo's health are "two separate issues," neither of which rendered defendants' performance impossible or impracticable.

Plaintiff argues defendants' contentions surrounding Angelo's health issues are "inconsistent," as his medical conditions started in September 2023, yet the parties agreed to settle in January 2023 and the Settlement Agreement was memorialized in April 2023, giving defendants more than enough time to arrange for the sale of the properties. Plaintiff also points out defendants never listed the Woodbridge property for sale, and defendants "were free to list or not list any or all" of the properties but instead chose not to, "with full knowledge" of the "contractual consequences" of not meeting the set deadlines.

In a thoughtful, comprehensive opinion, Judge Gary Wolinetz found defendants "failed to meet their explicit obligations under the terms of the Settlement Agreement," where plaintiff had "agreed to forbear from taking immediate action to collect the full payment . . . if [defendants] satisfied either

of the conditions of repayment described in [p]aragraph 6 of the Settlement Agreement." The judge noted that although the Settlement Agreement "contemplated" defendants could sell their properties, they were not "obligat[ed]" to do so and "it was their decision how their debt would be satisfied." Specifically, he observed the Settlement Agreement required defendants to "attempt to sell" the four properties and deliver the proceeds of each sale as it occurred. However, defendants "were not under any obligation" to satisfy the Settlement Agreement through the sale of the four properties. (Emphasis in original). That is because paragraph 6(f) also permitted defendants, "[n]otwithstanding anything" in paragraph 6(a) regarding the sale of the properties, to satisfy their debt via refinancing of the properties "or any other means so long as timely payment" was made in accordance with the Settlement Agreement. (Boldface omitted).

Judge Wolinetz explained "it [did] not matter whether the Brick property was actually listed or not, since [defendants'] opportunity to pay . . . was not contingent on selling [that] property." The judge found defendants' inability to cover the debt did not happen "in a vacuum, as they had the ability to attempt to cover their shortfall by placing the[] Woodbridge [P]roperty up for sale, or by refinancing [the] unsold properties, or, again, any other means."

The judge acknowledged Angelo's unfortunate illness, but found it did "not constitute 'fraud or other compelling circumstances' needed to justify modifying the [S]ettlement [A]greement. . . . Nor [wa]s there any assertion . . . [defendants] lacked capacity when they executed the Settlement Agreement." Furthermore, the judge deemed "the damage to the house and [Angelo]'s illness [were] not supervening events that support[ed] application of the doctrines of impossibility, impracticability, or frustration of purpose." While the events were not "anticipated . . . , they did not fundamentally alter the nature of the relationship" between the parties, a relationship "between debtors and a creditor." Defendants were permitted under the Settlement Agreement "to take whatever steps . . . necessary to pay the outstanding balance."

We affirm substantially for the reasons set forth by the trial judge. We add the following comments. Defendants could have listed all four properties in July 2023, but made a decision not to. Moreover, defendants failed to pay their obligation by "any other means," separate and apart from the sale of any property, as provided in the Settlement Agreement. Although the Settlement Agreement required defendants to "attempt to sell" the four properties, the intent of the Settlement Agreement was for defendants to pay plaintiff the agreed-upon settlement amount regardless of how the payments were funded. Given New

17

Jersey's strong policies favoring settlement agreements, and defendants' failure to show they should be excused from their required performance under the Settlement Agreement, we discern no basis to disturb the trial court's order denying modification of the Settlement Agreement.

B.

Defendants acknowledge plaintiff had the "right to approve or disapprove the sale" of the 22 Princeton Lane property, but rely on Wilson v. Amerada Hess Corp., for the proposition that "a party must exercise discretion reasonably and with proper motive when that party is vested with the exercise of discretion under a contract." 168 N.J. 236, 247 (2001). Defendants assert plaintiff's "bad faith . . . conduct is readily apparent." They contend any delay in the sale of the 22 Princeton Lane property "would have been de minimis." They further argue the trial court could have accounted for any additional delay by requiring defendants to pay an additional amount, but instead "side-stepped" the issue by finding the deadline passed and the property was no longer defendants' to convey. Defendants assert plaintiff "took advantage of the situation to obtain a $1.4 million windfall" and urge us to allow them to "re-list the property and sell it . . . to fund the settlement."

18

Plaintiff asserts that defendants raise their "newly-minted" argument regarding bad faith for the first time on appeal, and that such an argument is "specious." Plaintiff notes: defendants did not raise any breach of implied covenant of good faith and fair dealing below; defendants never advised plaintiff of Angelo's health issues and never asked for additional time under the Settlement Agreement until the eve of the January 14 deadline; whether done by sale or by recording of the deed in lieu of foreclosure, defendants received credit against their debt obligation for fair market value; and even if the 22 Princeton Lane property had sold for the contracted price, defendants still would not have been able to meet the January 14 deadline for payment of the discounted payoff amount of $3,750,000.

Here, Judge Wolinetz found defendants' "time to sell [the 22 Princeton Lane property] ha[d] passed, as they failed to close . . . prior to . . . January 14, 2024." He held plaintiff had "explicitly limited" defendants' ability to sell the properties to pay the debt if they did so prior to the deadline, as evidenced by paragraph 6 of the Settlement Agreement. Because defendants did not "have a signed and sealed contract" for the 22 Princeton Lane property and "no certification from the prospective buyer" existed, the judge opined the "prospective sale could fall through tomorrow."

The judge noted paragraph 7 required defendants to provide plaintiff with deeds in lieu of foreclosure to be held in escrow when they entered into the Settlement Agreement. Moreover, paragraph 7(f) permitted plaintiff to record the deeds in the event of default. Because plaintiff had "properly begun this process[,] [u]nder the express terms of the Settlement Agreement, 22 Princeton Lane [was] no longer [defendants]' property to sell."

In conclusion, the judge noted the court's "role is to enforce contracts" rather than "write . . . new and improved contracts," and recognized "New Jersey's strong policy in favor of the settlement of litigation," particularly given the sophistication of the parties in this matter. He noted defendants "had sufficient time in this booming housing market to sell their properties." The judge did not find Angelo's illness or the storm damage to the Brick property justified "the extraordinary relief of modifying" defendants' "financial obligations . . . under the Settlement Agreement." Defendants "made a choice about the way in which they intended to raise the required funds, [and] failed to pay [plaintiff] in a timely manner."

Defendants' bad faith arguments are raised for the first time on appeal. We ordinarily "will decline to consider questions or issues not properly presented to the trial court when an opportunity for such a presentation is

available 'unless the questions so raised on appeal go to the jurisdiction of the trial court or concern matters of great public interest.'" Nieder v. Royal Indem. Ins. Co., 62 N.J. 229, 234 (1973) (quoting Reynolds Offset Co. v. Summer, 58 N.J. Super. 542, 548 (App. Div. 1959)). Defendants' arguments do not implicate jurisdictional issues nor do they concern matters of great public importance. Therefore, we decline to address these arguments.

We conclude the trial judge did not err in denying defendants' request for additional time to sell the 22 Princeton Lane property. First, the judge correctly determined plaintiff acted in accordance with the Settlement Agreement in refusing to approve the contract which would not have closed within the timeframe set forth in the parties' agreement. Moreover, even if the court had extended the time for the sale of the 22 Princeton Lane property, the proceeds from the sale would not have satisfied the balance owed to plaintiff. Accordingly, the judge did not err in refusing to modify the Settlement Agreement between the two sophisticated parties in this matter.[4]

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

M.C. Harley

Clerk of the Appellate Division

---

[4] Given our decision affirming the trial court's March 8, 2024 order, we need not address plaintiff's argument that defendants' appeal was rendered moot by the court's actions subsequent to the entry of that order.