**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-0993-24

IN THE MATTER OF THE
ESTATE OF NUNZIO CIRELLA,
deceased.

_____

Submitted January 15, 2026 – Decided February 24, 2026

Before Judges Mawla and Marczyk.

On appeal from the Superior Court of New Jersey, Chancery Division, Essex County, Docket No. P-000131-24.

Anthony Scordo, PC, attorney for appellant Philip Cirella (Anthony Scordo III, of counsel and on the brief).

Brach Eichler LLC, attorneys for respondent Angela Tafro Scala (Eric J. Boden, of counsel and on the brief).

PER CURIAM

Defendant Philip Cirella, Sr. appeals from the trial court's December 3, 2024 order granting plaintiff Angela Tafro Scala's motion to enforce the parties' settlement agreement and awarding plaintiff attorney's fees.  We affirm.

## I.

This matter arises from a settlement agreement entered into following a will contest between plaintiff and defendant. In February 2024, plaintiff filed a caveat seeking to block the probate of decedent Nunzio Cirella's will. She subsequently filed an order to show cause and verified complaint regarding decedent's estate. Plaintiff's complaint alleged, among others, claims of undue influence and unjust enrichment against defendant, sought the return of assets defendant received from decedent through joint tenancy, and requested the court to invalidate the 2023 will and probate decedent's 1983 will. The order to show cause requested preliminary restraints against defendant, enjoining him from using the assets he received through joint tenancy with decedent and compelling him to account for all assets he received from decedent.

On May 1, 2024, following a hearing concerning plaintiff's request for temporary injunctive relief, the court ordered a May 31 return date for plaintiff's order to show cause. On May 10, it entered an order establishing temporary restraints against defendant, enjoining his use of funds from the estate in his possession. On June 4, it ordered the parties to participate in an Early Settlement Panel (ESP). On June 5, the court further restrained defendant's use of funds

2

received through joint tenancy with decedent and appointed defendant as temporary administrator of the estate.

On August 15, 2024, the parties, represented by counsel, executed a settlement term sheet during the ESP. That term sheet, in pertinent part, provided:

> [] The parties agree to probate the 1983 [w]ill of [decedent] . . . and the parties will provide all consents necessary to probate the 1983 [w]ill and appoint [plaintiff] as Administratrix, C.T.A. . . . .
>
> [] Within ten . . . business days, [defendant] agrees to disclaim, in writing, by formal disclaimer, all assets that were held in joint name with [decedent] or where [defendant] was named as a beneficiary . . . . The parties agree to cooperate to the release of all liens and frozen assets to effectuate the terms of this [a]greement.
>
> . . . .
>
> [] The parties will endeavor to agree to a formal written settlement agreement within [thirty] days. This document represents a binding agreement once signed by all parties. Should the parties fail to reduce this [a]greement to a full and formal written settlement agreement, any party may enforce this document according to its terms.

Thereafter, the parties negotiated the settlement agreement. Defendant signed the agreement on or around August 28, 2024, and plaintiff signed it on August 30, 2024. Section 1.1 of the agreement required defendant to send

3

cashier's checks to plaintiff in specified amounts "[w]ithin ten . . . business days of the [agreement's] [e]ffective [d]ate, or ten . . . business days of August 15, 2024, whichever [wa]s sooner."  In pertinent part, under sections 1.1(a) and (d), defendant was required to send plaintiff cashier's checks in the amounts of $309,473.85 and $35,884.12, respectively, representing funds contained in accounts at Provident Bank and Regal/Somerset Regal that defendant had held in joint tenancy with decedent.  Defendant was further required to make payments in the amounts of $173,709.66 and $66,942.38 to plaintiff pursuant to sections 1.1(b) and (c), which represented funds contained in two Bank of America accounts he had also held in joint tenancy with decedent.

Notably, section 1.9 of the settlement agreement provided, "[a]ny issues or complications in liquidating any account, holding, or securities shall not absolve [defendant] of his obligation to make the payments set forth in [s]ection 1.1(a) through (d)."  Section 6 stated the settlement agreement "contains the entire agreement between . . . the [p]arties and fully supersedes any prior understanding or agreements, whether written or oral, between any of the [p]arties."  Section 10, in pertinent part, also provided:

> If any party defaults in the performance of any obligation set forth in this [a]greement, and if the other party shall institute and prevail in legal proceedings to enforce the performance of such provisions by the

4

defaulting party, then the defaulting party shall pay to the other party the necessary and reasonable [c]ourt costs and attorney's fees incurred by the prevailing party in connection with such legal proceedings.

On August 30, 2024, defendant's attorney delivered cashier's checks to plaintiff's attorney pursuant to sections 1.1(a) and (d) of the settlement agreement. On September 6, 2024, plaintiff's attorney emailed defense counsel regarding defendant's failure to send plaintiff cashier's checks for the amounts contained in the two Bank of America accounts. In that email, plaintiff's counsel, in part, stated:

Critically, [defendant] agreed to [the settlement agreement's] terms knowing that additional steps were required to liquidate the Bank of America accounts. The estate department at Bank of America indicated that they advised [defendant] in April 2024 that certain tax steps were needed to release the Bank of America funds at issue.

[(Emphasis in original).]

On October 11, 2024, plaintiff moved to enforce the settlement agreement due to defendant's failure to make the required payments under sections 1.1(b) and (c) of the agreement for over a month after the payments were due. She filed a certification in support of her motion, in which she averred a senior banker from Bank of America had informed her she could not access decedent's accounts there, even as administratrix of decedent's estate, because those

accounts were in defendant's name. Plaintiff further certified the senior banker advised her he had informed defendant in April 2024 he would not be able to liquidate decedent's accounts without a tax waiver. She also included a September 26, 2024 email from defense counsel in which counsel noted "[a]ny lawyer familiar with estate practice knows a tax waiver is required to withdraw more than [fifty percent] of [a] decedent's accounts."

Defendant did not submit a certification in opposition to plaintiff's motion but filed a brief arguing it would be "impossible for [him] to tender to plaintiff[] the sums being held in the Bank of America" accounts because only an estate's administrator or executor may apply for the tax waiver necessary to fully liquidate the funds. Thus, as plaintiff was administratrix, defendant averred he could only liquidate one-half of the money contained in the two Bank of America accounts. Defendant also contended the settlement agreement did not make him personally liable for the amounts in those accounts and such "a term . . . was never discussed among the parties and was well outside the ambit of the mediation discussions and resolutions."

On December 3, 2024, following oral argument, the court entered an order granting plaintiff's motion to enforce the settlement agreement and directing defendant to pay plaintiff $240,652.78—the amount owed under sections 1.1(b)

6

and (c) of the agreement—by cashier's check within thirty days of the order's date. It found no basis to absolve defendant of making the required payments under the agreement, reasoning section 1.1's "language [wa]s clear that specific payments [we]re to be made within a specific time[frame]," and there was no "qualifying language except[,] putting an obligation on [defendant] . . . to release encumbrances, liens[,] or freezes needed to effectuate the agreement."

The court noted plaintiff, even as administratrix, could not authorize the transfer of money herself because it was contained in private bank accounts and not estate accounts. It rejected defendant's argument it was impossible for him to make the payments without a tax waiver from the State, noting defense counsel had asserted "[e]verybody sitting in th[e] room" negotiating the settlement agreement should have known about the tax waivers prior to the agreement's execution. The court also ordered defendant to pay plaintiff $5,529.60 in attorney's fees and costs pursuant to the counsel fee-shifting provision in section 10 of the settlement agreement.[1]

---

[1] The court also ordered defendant: to pay plaintiff $644 via cashier's check, representing the 2023 state income tax refund; to be responsible and liable for removing any and all liens and encumbrances on decedent's Bank of America accounts; and to sign all forms and provide all information necessary to effectuate the settlement agreement.

7

II.

On appeal, defendant principally argues he "did not breach the settlement agreement as compliance with the terms in effect at the time of the alleged breach was impossible[,] and the parties were acting under a mutual mistake of law." Accordingly, he contends his failure to pay plaintiff the amounts contained in the Bank of America accounts did not constitute a breach of the settlement agreement and, thus, avers the trial court's judgment in favor of plaintiff and award of attorney's fees should be reversed.

"A settlement agreement between parties to a lawsuit is a contract." Nolan v. Lee Ho, 120 N.J. 465, 472 (1990). The construction and interpretation of a settlement agreement is a matter of law and is subject to de novo review on appeal. Kaur v. Assured Lending Corp., 405 N.J. Super. 468, 474 (App. Div. 2009); see also Manahawkin Convalescent v. O'Neill, 217 N.J. 99, 115 (2014) ("When a trial court's decision turns on its construction of a contract, appellate review of that determination is de novo."). We "give 'no special deference to the trial court's interpretation and look at the contract with fresh eyes.'" Manahawkin Convalescent, 217 N.J. at 115 (quoting Kieffer v. Best Buy, 205 N.J. 213, 223 (2011)).

A-0993-24

"[T]he settlement of litigation ranks high in our public policy," and we "strain to give effect to the terms of a settlement wherever possible." Brundage v. Est. of Carambio, 195 N.J. 575, 601 (2008) (first quoting Jannarone v. W.T. Co., 65 N.J. Super. 472, 476 (App. Div. 1961); and then quoting Dep't of Pub. Advoc., Div. of Rate Couns. v. N.J. Bd. of Pub. Utils., 206 N.J. Super. 523, 528 (App. Div. 1985)). "Our strong policy of enforcing settlements is based upon 'the notion that the parties to a dispute are in the best position to determine how to resolve a contested matter in a way which is least disadvantageous to everyone.'" Ibid. (quoting Peskin v. Peskin, 271 N.J. Super. 261, 275 (App. Div. 1994)).

The interpretation of a settlement agreement is "governed by basic contract principles." Capparelli v. Lopatin, 459 N.J. Super. 584, 603 (App. Div. 2019). "'[A]bsent a demonstration of fraud or other compelling circumstances,' a court should enforce a settlement agreement as it would any other contract." Id. at 603-04 (quoting Jennings v. Reed, 381 N.J. Super. 217, 227 (App. Div. 2005)) (internal quotation marks omitted). "[C]ourts enforce contracts based on the intent of the parties, the express terms of the contract, surrounding circumstances and the underlying purpose of the contract." In re Cnty. of Atlantic, 230 N.J. 237, 254 (2017) (quoting Manahawkin Convalescent, 217 N.J.

at 118) (internal quotation marks omitted). "A reviewing court must consider contractual language 'in the context of the circumstances at the time of drafting . . . .'" Ibid. (quoting Sachau v. Sachau, 206 N.J. 1, 5-6 (2011)) (internal quotation marks omitted).

"[W]hen the intent of the parties is plain and the language is clear and unambiguous, a court must enforce the agreement as written, unless doing so would lead to an absurd result." Capparelli, 459 N.J. Super. at 604 (quoting Quinn v. Quinn, 225 N.J. 34, 45 (2016)). As with the interpretation of any other contract, a court shall not rewrite a settlement agreement "to provide a better bargain than contained in [the parties'] writing." Kaur, 405 N.J. Super. at 477 (quoting Grow Co. v. Chokshi, 403 N.J. Super. 443, 464 (App. Div. 2008)).

"Impossibility or impracticability of performance are complete defenses where a fact essential to performance [of a contract] is assumed by the parties but does not exist at the time for performance." Connell v. Parlavecchio, 255 N.J. Super. 45, 49 (App. Div. 1992). "Even if a contract does not expressly provide that a party will be relieved of the duty to perform if an unforeseen condition arises that makes performance impracticable, 'a court may relieve [them] of that duty if performance has unexpectedly become impracticable as a result of a supervening event.'" Facto v. Pantagis, 390 N.J. Super. 227, 231

10

(App. Div. 2007) (quoting Restatement (Second) of Conts. § 261 cmt. a (Am. L. Inst. 1981)).

"The basis of the defense is 'the presumed mutual assumption when the contract is made that some fact essential to performance then exists, or that it will exist when the time for performance arrives.'" Petrozzi v. City of Ocean City, 433 N.J. Super. 290, 303 (App. Div. 2013) (quoting Duff v. Trenton Beverage Co., 4 N.J. 595, 605 (1950)). Thus, the inquiry "is whether the condition 'is of such a character that it can reasonably be implied to have been in the contemplation of the parties at the date when the contract was made.'" Ibid. (quoting Duff, 4 N.J. at 605). "[T]he parties must not have reasonably foreseen the change that rendered the contract performance impossible or impracticable." Ibid. In sum:

> A successful defense of impossibility (or impracticability) of performance excuses a party from having to perform its contract obligations, where performance has become literally impossible, or at least inordinately more difficult, because of the occurrence of a supervening event that was not within the original contemplation of the contracting parties.
>
> [JB Pool Mgmt. v. Four Seasons at Smithville Homeowners Ass'n, 431 N.J. Super. 233, 246 (App. Div. 2013).]

11

"The supervening event must be one that had not been anticipated at the time the contract was created, and one that fundamentally alters the nature of the parties' ongoing relationship." Id. at 245. The doctrine is "concerned with '[a]n extraordinary circumstance [that] may make performance [of a contract] so vitally different from what was reasonably to be expected as to alter the essential nature of that performance.'" Ibid. (alterations in original) (quoting Restatement (Second) of Conts. ch. 11, intro. note). Even where a party "is excused from performance as a result of an unforeseen event that makes performance impracticable[ or impossible], the other party is also generally excused from performance." Facto, 390 N.J. Super. at 233-34. Thus, the party claiming impracticability or impossibility "cannot demand something for nothing from the other party." Id. at 234 (quoting 14 Corbin on Contracts § 78.2 (rev. ed. 2001)).

Defendant maintains the settlement agreement was not in effect at the time he allegedly breached it on August 29, 2024, because the settlement term sheet was still binding as the settlement agreement did not become effective until plaintiff signed it on August 30. Accordingly, he asserts the "only breach that possibly could have occurred" was his failure to disclaim all assets he held jointly with decedent within ten days of the term sheet becoming effective.

12

Defendant also notes plaintiff failed to cooperate with him in releasing liens and frozen assets. He further contends he proposed seeking a court order designating the frozen Bank of America accounts as property of the estate but avers plaintiff would only accept payment in full.

Additionally, defendant asserts both parties were acting under a mutual mistake of law regarding his ability to liquidate the Bank of America accounts within the timeframe laid out in the settlement agreement and, thus, contends that aspect of the agreement cannot be enforced. He avers neither party realized he could not file for an inheritance tax waiver from the Division of Taxation for Bank of America to waive the liens until an inheritance tax return had been filed, which could not be done until after a nine-month waiting period.

Having considered defendant's arguments and the applicable law, we discern no basis to disturb the trial court's decision to enforce the settlement agreement. We are unpersuaded by defendant's contention "compliance with the terms in effect at the time of the alleged breach was impossible." The fact defendant may not have been able to liquidate the accounts by the time payments were due under the settlement agreement was foreseen by the parties. In fact, the parties explicitly addressed this issue in section 1.9 of the agreement, which stated, "[a]ny issues or complications in liquidating any account . . . <u>shall not</u>

13

<u>absolve</u> [defendant] of his obligation to make the payments set forth in [s]ection 1.1(a) through (d)."  (Emphasis added).  Moreover, as the court correctly recognized, defendant did not condition his promise to pay plaintiff on his ability to liquidate the accounts identified in the agreement.

The settlement agreement does not contain any qualifying language specifying the cashier's checks must come from the joint accounts but rather provided defendant must send the checks "in the amounts set forth in" the four bank accounts enumerated in sections 1.1(a) through 1.1(d).  Defendant's argument to the contrary would improperly render section 1.9 of the settlement agreement meaningless.  <u>See</u> <u>Porreca v. City of Millville</u>, 419 N.J. Super. 212, 233 (App. Div. 2011) (quoting <u>Cumberland Cty. Improvement Auth. v. GSP Recycling Co.</u>, 358 N.J. Super. 484, 497 (App. Div. 2003)) ("A contract 'should not be interpreted to render one of its terms meaningless.'").  Given the parties contemplated possible issues liquidating certain accounts, we conclude the court appropriately rejected defendant's impossibility argument and enforced the settlement agreement.

Defendant's mutual mistake argument was not raised before the trial court. "Generally, an appellate court will not consider issues, even constitutional ones, which were not raised below."  <u>State v. Galicia</u>, 210 N.J. 364, 383 (2012).

14

Appellate courts do not "consider questions or issues not properly presented to the trial court when an opportunity for such a presentation is available 'unless the questions so raised on appeal go to the jurisdiction of the trial court or concern matters of great public interest.'" Nieder v. Royal Indem. Ins. Co., 62 N.J. 229, 234 (1973) (quoting Reynolds Offset Co. v. Summer, 58 N.J. Super. 542, 548 (App. Div. 1959)). This appeal involves neither an issue regarding jurisdiction nor a matter of great public importance warranting departure from this general rule. Nevertheless, we reiterate section 1.9 of the settlement agreement specifically contemplated and addressed the issue raised by defendant.

We likewise affirm the trial court's order awarding plaintiff attorney's fees. Defendant does not dispute section 10 of the settlement agreement provided for fee-shifting, and he does not challenge the reasonableness of the fees awarded by the court. He only contends attorney's fees should not have been awarded because he did not breach the settlement agreement. Because we have determined the trial court did not err in enforcing the settlement agreement, we are unpersuaded by defendant's argument.

A-0993-24

To the extent we have not specifically addressed any remaining arguments defendant raised, we conclude they lack sufficient merit to warrant discussion in a written opinion. R. 2:11-3(e)(1)(E).

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

M.C. Harley

Clerk of the Appellate Division

16

A-0993-24